158 N.J. Super. 196 (1978)
385 A.2d 932
PENNSYLVANIA NATIONAL TURF CLUB, INC., PLAINTIFF-RESPONDENT,
v.
BANK OF WEST JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 14, 1978.
Decided April 6, 1978.
*198 Before Judges HALPERN, LARNER and KING.
Mr. Peter N. Perretti, Jr. argued the cause for appellant (Messrs. Riker, Danzig, Scherer & Debevoise, attorneys; Mr. Peter N. Perretti, Jr. and Mr. Robert Fischer, III, of counsel and on the brief).
Mr. William B. Scatchard, Jr. argued the cause for respondent (Messrs. Capehart & Scatchard, attorneys).
Mr. Michael F. Spicer appeared and filed a brief amicus curiae for the New Jersey Bankers Association (Messrs. Jamieson, McCardell, Moore, Peskin & Spicer, attorneys; Mr. Israel Spicer, of counsel and on the brief).
The opinion of the court was delivered by LARNER, J.A.D.
After a plenary nonjury trial the judge entered judgment in favor of plaintiff against defendant drawee bank in the sum of $123,313.06, representing the *199 balance due on nine checks cashed by plaintiff for the bank's depositor which were returned because of insufficient funds. The factual background of this litigation is both interesting and essential for an understanding of the determination of the legal issues involved.
Pennsylvania National Turf Club, Inc. (Turf Club) is engaged in the operation of a race track in Dauphin County, Pennsylvania. As part of its business enterprise it established a check cashing service for the owners and trainers who did business at the track. Eugene Zeek was a horse trainer who engaged in extensive activities at plaintiff's track and availed himself of the check cashing service established by the Turf Club. This entailed cashing of checks for thousands of dollars on a regular daily basis. The checks were written by Zeek as maker and drawn on the Zeek account in defendant Bank of West Jersey (bank) located in Mt. Laurel, New Jersey. Plaintiff deposited the checks in its bank in York, Pennsylvania, and in due course the checks were processed through the clearing house for payment by defendant bank.
Zeek's checking account with defendant Bank was established in April or May 1973. Soon afterwards Zeek indicated to Frank Pine, branch manager of defendant's Mt. Laurel office, that he would soon be completing a major business deal which would generate six-figure balances in his bank accounts. As a result of this potential future windfall, the bank agreed to a special arrangement for the handling of Zeek's checks, whereby he would be permitted to cover his checks as presented on a daily basis.
Each morning Zeek would call Pine to ascertain to what extent his account was overdrawn because of checks presented for payment the previous day. Zeek would then arrange to cover the overdraft, usually by dispatching his pilot in his private plane with sufficient cash to pay the checks. The cash sums often approached $100,000 (including funds to cover checks cashed by other parties not involved in this litigation). This procedure continued until mid-December, *200 although an occasional delivery in November or December was delayed, apparently by weather conditions.
Manifestly, this regular arrangement for handling payment of checks was unusual and not in accordance with the bank's normal practice. However, Pine and the bank president felt it was potentially profitable to engage in this unorthodox practice because of the expectation of the large account balances in the near future. (To cover the administrative expenses of the arrangement, the bank eventually imposed service charges of $5 for processing each check in this fashion and $5 for counting each cash deposit.) Furthermore, Zeek and Pine developed a close relationship, nourished by frequent entertainment of Pine at the track, which often included placing Pine's wagers on unrevealed horses which frequently finished in the money.
On December 20, 1973 deposits ceased while checks continued to arrive. However, Zeek and his purported wife continued to call Pine on a daily basis, informing him that they were putting the finishing touches on the "big deal" and would be covering the checks within a few days. The total accumulated overdraft in Zeek's account had risen to almost a million dollars by New Year's Eve, when Mrs. Zeek called Pine at home to say that things had been progressing more slowly than anticipated and that the necessary cash deposit would be made January 2.
When January 2 came and went with no word from Zeek, Pine began to get uneasy for the first time. He informed his superiors, who decided to protect the bank's interests by returning Zeek's checks. On Friday, January 4, 1974, the bank returned to the Federal Reserve Bank in Philadelphia 29 checks made by Zeek and cashed by the Turf Club which had been presented for payment between December 20, 1973 and January 3, 1974. The actual return of the checks was preceded by a telephone call to the Federal Reserve in accordance with applicable regulations. Each check was inscribed on its face "Refer to Maker" and was returned *201 through the normal process to plaintiff's bank in York, Pennsylvania, and charged back to plaintiff's account.
On Saturday, January 5, Pine traveled to Harrisburg, Pennsylvania, in search of Zeek, and found that the Zeek home was unoccupied and devoid of all signs of recent habitation. It was then that Pine first fully realized that there were serious problems. Information relayed to the court by counsel revealed that Zeek had been traced to Granada, a small Caribbean island nation.
Of the 29 checks returned on January 4, 20 were presented prior to January 3, 1974 and 9 were presented on January 3. Pursuant to plaintiff's motion, summary judgment was entered in its favor in the sum of $281,200 without opposition by defendant, representing the balance due on the 20 checks presented prior to January 3. This result was mandated by the provisions of the Uniform Commercial Code (N.J.S.A. 12A:4-301, 302(a)) which impose liability on a payor bank for losses resulting from the failure to return a demand item by midnight of the day after receipt of the item. The question of liability for the nine checks, however, which were returned before the statutory deadline, was held for trial and resulted in the judgment for plaintiff which is the subject matter of this appeal.
The trial judge structured his finding of liability on general principles of tort law, holding that the bank's pattern of conduct in handling the Zeek account throughout its existence constituted a negligent failure to exercise reasonable care which, in turn, permitted Zeek to carry out his scheme to the damage of the Turf Club. He went one step further in concluding that the bank's practices constituted bad faith justifying the measure of damages authorized by N.J.S.A. 12A:4-103(5).
We conclude that the trial judge erred and that the bank cannot be held liable to the Turf Club under any legal theory regardless of the patently unbusinesslike deviations from good banking practices in the handling of the Zeek account.
*202 The pattern of conduct of the bank consisted of repetitive failures to dishonor and return checks within the midnight deadline prescribed by the Code and banking regulations. Whatever motivations existed for the favored treatment accorded this one depositor, the bank's duty under the Code to payees or holders of the checks was limited to compliance with the requirements pertaining to the dishonor and return of bad checks. The Code does not contain any other provision which creates an obligation on the part of the drawee bank to return checks issued by its depositor when sufficient funds are not available in his account. And if there is compliance with the duties prescribed by N.J.S.A. 12A:4-301, under the facts herein there can be no further specific Code liability to others who have suffered losses because of their acceptance of checks from a maker which are not collectible because of insufficient funds. In fact, N.J.S.A. 12A:4-301(1) absolves the bank from liability by authorizing the clearing house settlement and recovery of payment if it has dishonored and returned the check by the midnight deadline.
Reference to N.J.S.A. 12A:4-103(5) as a fount of liability for the mismanagement by defendant bank is misplaced. This provision is one which defines the measure of damages for failure to exercise ordinary care in handling an item. It does not create a basis of liability. Furthermore, since the improper action or inaction of the bank and its employees relates to the process of handling dishonored items, liability, if any, arises from N.J.S.A. 12A:4-302 and not N.J.S.A. 12A:4-103(5). See 3 Anderson, Uniform Commercial Code (2 ed. 1971), § 4-103:7 at 173. And since the bank complied with these Code provisions with respect to the nine checks in question it manifestly exercised ordinary care as to these items. In contrast, the bank failed to comply with the Code requirements in neglecting to return the other 20 checks by the midnight deadline and was therefore held accountable for the resulting loss.
*203 We recognize that although a bank has complied with the Code provisions, such compliance does not necessarily immunize it from ordinary tort liability. However, a fundamental requisite for tort liability is the existence of a duty owing from defendant to plaintiff. See Goldberg v. Newark Housing Auth., 38 N.J. 578, 583 (1962); Brody v. Albert Lifson & Sons, 17 N.J. 383, 389 (1953). In the context of the record facts herein, the bank owed no general duty to Turf Club by way of warning or other notice, merely because the latter undertook to cash its depositor's checks, which turned out to be dishonored for insufficient funds. Beyond the duty relating to return of the instruments, the drawee bank herein had no duty arising out of a relationship to the holder of the checks which could ripen into tort liability. In the absence of evidence of any agreement, undertaking or contact between plaintiff and defendant from which any special duty can be derived, the improper handling of the Zeek account cannot in the abstract serve as a stepping stone for liability to plaintiff.
The record reflects the fact that plaintiff cashed Zeek's checks on a daily basis in very substantial amounts in conjunction with the profitable business created by Zeek at plaintiff's track. Plaintiff was the party who assumed the risk associated with that hazardous activity. And just as the bank acted foolishly to its great detriment, plaintiff was equally foolhardy in continuing to cash Zeek's checks late in December even though they were not being seasonably paid. The bank's practices in no respect produced plaintiff's loss  a loss which was brought about solely through plaintiff's relationship with and reliance upon the trustworthiness of Zeek. Plaintiff cannot recoup by attempting to shift responsibility to the bank which had no relationship with it.
The judgment below is reversed and the matter is remanded for entry of judgment in favor of defendant.