[Civ. No. 52811. Second Dist., Div. Five. Sept. 25, 1978.]

RUTH WELLS, Plaintiff and Appellant, v.
JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY,
Defendant and Respondent.

**COUNSEL**

Jack L. Wells for Plaintiff and Appellant.

Meserve, Mumper & Hughes and Paul G. George for Defendant and Respondent.

## OPINION

KAUS, P. J.—Plaintiff, Ruth Wells, appeals from judgment in favor of defendant John Hancock Mutual Life Insurance Company (John Hancock) after John Hancock's demurrer to her first amended complaint was sustained with leave to amend, but she failed to do so.

## FACTS

The various causes of action which plaintiff has attempted to allege against John Hancock, arise out of these basic facts:

One Robert S. Parker, who died on March 11, 1975, had been plaintiff's accountant and financial adviser for over 20 years. Between May 1, 1973, and August 1, 1974, plaintiff loaned Parker a total of $31,000.[1] On September 1, 1974—one month after the last loan had been made to him—Parker assigned to plaintiff as security for these loans a life insurance policy which John Hancock had issued to him on January 20, 1972. The policy in question was a 10-year decreasing term policy, which at no time had any surrender or nonforfeiture value. The initial sum insured was $100,000. At the time of the assignment to plaintiff it was $85,900. At the time of issue, Parker had been 46 years old.

The assignment was executed on a printed form furnished by John Hancock. It recites the amount of the loan which the policy purportedly secures—$31,000. A duplicate of the assignment was filed at John Hancock's home office on October 3, 1974. On that date John Hancock in fact acknowledged receipt of the assignment as follows: "The John Hancock Mutual Life Insurance Company, without assuming any responsibility for the validity or the sufficiency of the foregoing assignment, has, on this date, filed a duplicate thereof at its Home Office." This acknowledgment is itself part of John Hancock's printed form.[2]

---

[1] The loans were evidenced by three promissory notes. The first, in the amount of $15,000, was executed on May 1, 1973, and payable on May 1, 1976; the second in the amount of $6,000, was executed on December 6, 1973, and repayable in installments; the third note in the sum of $10,000 was dated August 1, 1974, and payable in full on August 1, 1977.

[2] Right below the John Hancock signature line appears a six-part "notice," the first part of which reads as follows: "The company furnishes this form of assignment for the convenience of the parties, and it assumes no responsibility for its sufficiency or validity."

On May 22, 1974, however, Parker had assigned the same policy to First Los Angeles Bank to secure a loan of $35,000. This assignment had also been filed with John Hancock's home office on June 14, 1974, but John Hancock at no time advised plaintiff of its existence.

Another blemish of the assignment was that at the time John Hancock received and acknowledged the assignment, the policy did not really exist—it had in fact lapsed for nonpayment of premiums and the passage of the grace period.[3] John Hancock at no time advised plaintiff of the fact that the policy had lapsed.

## THE FIRST AMENDED COMPLAINT

The first amended complaint contains five causes of action, only four of which concern John Hancock, the first being directed against the administrator of Parker's estate. The second cause of action, labeled "FRAUD AND DECEIT," alleges that John Hancock fraudulently represented to plaintiff that there had been no prior assignment of the policy and that it was in full force and effect and that John Hancock made these misrepresentations intending to defraud plaintiff in various respects.[4] Had plaintiff been advised of the true condition of the policy she would have taken "necessary action to obtain other, more adequate, security for the . . . three notes." In addition, John Hancock's nondisclosure of the lapse of the policy prevented plaintiff from attempting to revive it by paying the overdue premiums and submitting proof of insurability.[5]

The third cause of action, labeled "NEGLIGENCE," omits the allegations of intentional fraud and pleads more benignly that John Hancock negligently failed to inform plaintiff that there had been a prior assignment and that the policy had lapsed.

---

[3]The policy could, however, have been reinstated on evidence of insurability satisfactory to John Hancock and payment of overdue premiums with interest.

[4]". . . with the intent to defraud and deceive plaintiff, to lull her into an unwarranted sense of security, to induce her not to pay premiums due or require ROBERT S. PARKER to submit evidence of insurability, to induce her to forbear making an investigation into ROBERT S. PARKER's financial condition or to otherwise take any action calculated to obtain other, more adequate, security for the aforementioned three notes."

[5]See footnote 3, ante. Plaintiff does not allege that proof of Parker's insurability could have been furnished. We note again that Parker died only six months later; we are not told, however, whether his death was accidental or the result of an illness which made him uninsurable in October 1974. One can, of course, speculate that his proven ability to borrow large sums of money on a term policy suggests that he did not look well.

Plaintiff's fourth cause of action repeats the gist of the second and third counts and adds the conclusion that by reason of the pleaded facts John Hancock "is estopped to claim that the subject policy was not in full force and effect" at the time of Parker's death.

The fifth cause of action seeks declaratory relief against all defendants. It adds no relevant allegations, but does contain the intriguing news that on January 20, 1975, Parker had once more assigned the policy to one Phyllis Bracker as security for a loan of $15,000.

## DISCUSSION

Of course, if anybody connected with the litigation had taken seriously plaintiff's allegations of actual, intentionally misleading fraud, we would not be here, for no court would have sustained defendant's general demurrer to the entire complaint. In truth, plaintiff has always made it clear that in spite of the liberal use of pejoratives in her pleadings, her grievance is not any hard-core lie by John Hancock, but its failure to advise her, in connection with its acknowledgment of having received a copy of the assignment, that the policy had lapsed and that there had been a previous assignment to another creditor of Parker.

What it boils down to is simply this: When a life insurance company is advised that a policy issued by it has been assigned as security for a loan and acknowledges in writing that it has received a duplicate of such assignment, is it under a duty to inform the assignee that it has been advised of other assignments of the same policy, that the policy has lapsed for nonpayment of premiums, or both?

█ *The Previous Assignment*: Plaintiff gives us neither authority nor persuasive reason for holding that John Hancock was under any obligation to advise her of the previous assignment of which it had notice.[6] John Hancock had no way of knowing whether the debt secured by that assignment had been paid off in whole or in part or whether the Los Angeles Bank had accepted different security for the loan due to it. John Hancock's books are not like the records of a county recorder, where satisfaction of mortgages and reconveyances of deeds of trust are recorded. To advise plaintiff that Parker had made a previous loan on the

---

[6]It so happens that under the facts of this case the previous assignment was the least of plaintiff's worries. As noted, the sum insured at the time of Parker's death was $85,900 and the previous assignment secured a loan of $35,000, leaving plenty to satisfy plaintiff's three notes.

strength of the policy could have been an officious betrayal of confidential information, serving possibly no useful purpose.

In brief, we are satisfied that John Hancock was under no duty to reveal previous assignments known to it.

*The Lapse of the Policy.* The fact that at the time John Hancock acknowledged receiving a copy of the assignment the policy had actually lapsed, presents an entirely different problem. Unlike a previous assignment—which may or may not be still in effect as far as the insurer knows—the fact that a policy has lapsed and that, therefore, the insurer is under no legal obligation if the insured dies, is, of course, a fact of which the insurer must be fully aware.

The simple question to be decided by us is, therefore, whether under all of the circumstances John Hancock was under a duty to advise plaintiff that the policy which she had accepted as security for a $31,000 loan was, in fact, worthless?

Several considerations are relevant to a correct answer:

First: this is not a case of a former obligor who has casually learned that a former obligee has purported to assign the extinguished obligation for value and who would have to go out of his way to tell the assignee that he has bought the Brooklyn Bridge. Since John Hancock was returning the duplicate assignment form to plaintiff anyway—precisely as was contemplated by its own procedures—it would not even have had to buy an extra stamp to advise plaintiff that the assignment was worthless.

Second: John Hancock is not entirely a disinterested third party in connection with assignments of the policies it sells. Life insurance companies conduct business of a "quasi-public nature." (*Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 673 [79 Cal.Rptr. 106, 456 P.2d 674].) The life insurance industry as a whole and—according to the allegations of the complaint—John Hancock in particular, have quite properly emphasized the role of life insurance policies as convenient security devices. In order to regularize assignment procedures with respect to its own policies and to keep itself advised, John Hancock has devised a useful form on which such assignments for security purposes can be made and which does double-duty as a means of notifying John Hancock of the assignment and, in turn, of notifying the parties that John Hancock has been so notified. By thus involving itself in the transaction,

John Hancock acts in part in its own interest: it not only promotes the efficiency of life insurance policies as a security device, but also keeps itself informed concerning the changing interests of owners and creditors of owners in the policies which it has issued.[7]

Third and most vitally: As between the creditor who accepts a life insurance policy as security for a debt and the life insurance company itself, knowledge concerning the legal status of the policy is peculiarly that of the insurer. A long unbroken line of California decisions recognizes that such disparity of knowledge may result in an imperative of disclosure. (*Massei* v. *Lettunich* (1967) 248 Cal.App.2d 68, 73 [56 Cal.Rptr. 232] [duty to disclose that lots were on filled land]; *Rothstein* v. *Janss Investment Corp.* (1941) 45 Cal.App.2d 64, 68 [113 P.2d 465] [ditto]; *Curran* v. *Heslop* (1953) 115 Cal.App.2d 476, 480 [252 P.2d 378] [failure to disclose violation of State Housing Act, not discoverable on casual inspection]; *Barder* v. *McClung* (1949) 93 Cal.App.2d 692, 697 [209 P.2d 808] [failure to disclose violation of zoning ordinances]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 462.)[8] We think the present situation easily falls within the principle of these decisions.

■ In sum, since the processing of assignments of policies was part of John Hancock's regular business, since its involvement served a business purpose of its own and, finally, since it was fully aware of a vital fact—the lapse of the policy—unknown to the plaintiff, we hold that it was under a duty to disclose that fact.[9]

---

[7]The policy provides: "The Company will not be on notice of any assignment unless it is in writing, nor until a duplicate of the original assignment has been filed at the Home Office of the Company. The Company assumes no responsibility for the validity or sufficiency of any assignment."

[8]The rule is stated in the Restatement Second of Torts in section 551 as follows: "(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question. (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, . . . (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

[9]Actually a layman may think that it would have been so natural for John Hancock to note that the assignment of which it was notified and which it formally acknowledged was, in fact, worthless, that a jury might reasonably infer that the failure to do so amounted to more than mere nondisclosure: that it was an implied representation that

John Hancock makes much of the disclaimer of responsibility which appeared just above the signature on the printed form and the "notice" just below that signature. It argues in its brief that these caveats indicate that it was not warranting the *"validity or sufficiency* of the policy as collateral." (Italics ours.) This argument rests, with all respect, on a total misunderstanding or misreading of the two provisions. In one John Hancock declares that it assumes no responsibility for the validity or the sufficiency of "the foregoing assignment. . . ." In the "notice" it again assumes no responsibility "for *its* sufficiency or validity." (Italics ours.) In context, the "it" may be the form of assignment or the assignment itself. (See fn. 2, *ante.*) Certainly, neither disclaimer has anything to do with the validity or sufficiency of the policy itself. The point has no merit.

To support its claim that it had no duty to notify plaintiff of the lapse of the policy, John Hancock relies on a series of cases which stand for the proposition that the insurer is under no obligation to notify an assignee that premiums are coming due and that the policy is about to lapse.[10] (See 2A Appleman, Insurance Law and Practice, § 1315; 5 Couch, Insurance (2d ed.) § 30.143, p. 677.) The validity and good sense of these authorities need not be questioned. They are, however, not in point. Plaintiff does not contend that she would have been entitled to continuous nudges from John Hancock concerning matters that had to be done in order to keep the policy alive. All that she claims is that if the company is notified in writing that the insured has purported to assign the policy and the company acknowledges that it has received such notification and knows that the policy has, in fact, lapsed, it should advise the assignee of that fact. We think that simple fairness demands nothing less.

If we are correct so far, and John Hancock was under an obligation to advise plaintiff what it knew for a fact—that the policy had lapsed—our holding really swallows up plaintiff's purported cause of action for negligence: there is no point in asking whether John Hancock was negligent in failing to inform plaintiff about the true status of Parker's policy when it was under a positive obligation to do so.

the policy was valid. We need not and do not go that far in our holding. We merely cite the reasonableness of such a conclusion in support of what we do hold: that there was a duty to speak.

[10]This apparently general rule of law was changed by the 1975 enactment of section 10173.2 of the Insurance Code, obligating the insurer to give the assignee not less than ten days notice before "the final lapse of the policy, . . ." It permits the insurer to charge $2.50 for each such notice.

*Estoppel*: In plaintiff's fourth cause of action she claims that by reason of all of the facts previously pleaded, John Hancock is "estopped to claim that the subject policy was not in full force and effect at the time of Robert S. Parker's death." If that pleading was intended as nothing but another way of asserting that John Hancock should have revealed that the policy had lapsed, it presumably does no harm. If, as seems more likely, the claim of estoppel is intended to dispense with the proof of damages, some remarks are in order.

All that we have held so far is that John Hancock should have informed plaintiff that the policy had lapsed. Although plaintiff sanguinely pleads that, had she been so informed, she would have taken "necessary action to obtain other, more adequate security," the general impression one gets from the few facts pleaded in the complaint is that no such security would have been available, that Parker was barely one step ahead of his creditors and that John Hancock's failure to inform plaintiff that her security was worthless probably caused no damage. If, on the other hand, it were the law that John Hancock is estopped to claim that the policy was not in full force and effect, plaintiff would find herself in a creditor's paradise: there would be $85,900 in insurance, plenty to satisfy her and all the other assignees who have surfaced so far. Yet, at least as far as this plaintiff is concerned, an estoppel to deny full coverage would be an undeserved windfall: it should be recalled that plaintiff had parted with her $31,000 long before there were any communications from John Hancock. By no stretch of the facts, therefore, can she claim that whatever John Hancock did or did not do caused her to relinquish $31,000. Her loss is measured by the "other, more adequate, security" she was led not to demand and obtain. The burden of proving the exact amount of such loss cannot be swept under the rug by a glib slogan: that John Hancock is estopped to deny full coverage.

The judgment is reversed.

Stephens, J., and Hastings, J., concurred.