[Nos. A030944, A032033. First Dist., Div. Two. Nov. 26, 1985.]

CHICAGO TITLE INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
CALIFORNIA CANADIAN BANK, Real Party in Interest.

COUNSEL

Pillsbury, Madison & Sutro, Walter R. Allan, Frank E. Sieglitz, Stephen Stublarec and John M. Grenfell for Petitioner.

No appearance for Respondent.

Thelen, Marrin, Johnson & Bridges, Ted W. Harris, Jon T. Anderson, Thomas W. Lathram and Kennedy P. Richardson for Real Party in Interest.

OPINION

SMITH, J.—Chicago Title Insurance Company petitions for two writs of mandate. The first (A030944) seeks review of respondent court's order compelling discovery of petitioner's in-house counsel. The second (A032033) requests vacation of respondent court's order granting summary adjudication of petitioner's first, third and fifth causes of action. We have ordered the two writs consolidated.

These consolidated petitions for writs of mandate arise from a law suit filed by Chicago Title Insurance Company (CTI) against California Canadian Bank (Bank). In its complaint CTI generally alleged that at all relevant times Robert Dean Financial (RDF)[1] was a corporation which had checking, escrow and trust accounts at the San Mateo branch of Bank. George I.

---

[1] In supporting documents to the petitions RDF is described as a corporation which was doing business as a mortgage broker.

Benny (Benny)[2] was purportedly engaged in the business of purchasing, selling and borrowing against real property. CTI acted as an escrow agent in the transfer of funds from RDF to Benny in transactions whereby RDF delivered to CTI checks drawn on RDF's trust and escrow accounts at the Bank.

With respect to RDF and Benny, the complaint alleged that both RDF and Benny represented to CTI that said checks were for the financing and refinancing of loans by RDF to Benny, which loans were to be secured by deeds of trust against properties owned by Benny. In connection with these transactions, RDF represented that it was delivering good and sufficient funds to CTI and, in reliance on these representations, CTI issued and delivered to Benny checks made payable to Benny equal to the amount of the RDF checks less escrow charges. The complaint then claims that the purported loan transactions were fraudulent shams designed to induce CTI to pay money to Benny in exchange for RDF checks drawn on nonexistent funds at the Bank. As part of the fraud and in order to conceal it from CTI, Benny, in most cases, endorsed the CTI checks to RDF, which deposited them in its accounts at Bank to cover the checks drawn on nonexistent funds.[3]

During the five-month period during which the fraud operated, approximately $300 million in checks passed in and out of the RDF accounts at

---

[2]Benny was apparently involved in multiple fraudulent real estate schemes. According to an indictment filed by the United States Attorney's office, Benny fraudulently obtained funds from Wells Fargo Bank for the purpose of purchasing a 396 apartment complex in San Francisco, known as Diamond Heights Village. After Benny purchased the complex he converted the individual units into condominiums. From October of 1979 through 1981, Benny and others were engaged in a massive fraudulent scheme to sell the individual units. Benny was eventually tried and convicted of mail fraud in connection with the sale of the condominiums. He was sentenced to 30 years in prison.

[3]In a separate action, CTI gave a different perspective of the fraudulent scheme. In the complaint filed by CTI against Employers Insurance of Wausau, the company that bonded CTI employees, the following allegation appears concerning the activities of James Fagerhaugh, the CTI escrow officer who handled the RDF-Benny transactions: "Fagerhaugh caused escrow files to be established at Chicago Title's Pine Street office and Chicago Title checks to be issued to Benny to 'close' the ostensible escrow transactions. The ostensible purpose of these escrows was to process loans from RDF to Benny. Fagerhaugh knew that the real purpose of the escrows was to divert Chicago Title property to Benny. He knew that there was no proper reason for Chicago Title's checks to be issued to Benny. Nevertheless, he supervised the manipulation at Chicago Title of documents to 'support' the sham appearance that Benny was receiving loan proceeds through escrow. He held the RDF checks, the receipts therefor and the records of his issuing Chicago Title checks, until Benny had sufficient opportunity to make use of the Chicago Title checks by either 'funding' the escrow with the proceeds or applying the proceeds to the benefit of Benny and RDF."

Bank. In the process, RDF and Benny siphoned off nearly $17 million for their private use.[4]

With respect to defendant, the complaint alleged that the Bank had knowledge of unusual activity in RDF accounts commencing on or about October 19, 1981. From that time forward RFD accounts appeared regularly on the Bank's daily "kite suspect" and overdraft lists. After the Bank conducted an investigation of the activity in the RDF accounts, it concluded that a "kite"[5] was occurring, and on or around December 1, 1981, a recommendation was made that the RDF accounts should be closed.

The complaint further alleged that despite recognition of the improper use of the account, the recommendation of the auditors was not followed. Instead, the Bank assisted, collaborated and conspired with RDF and Benny in perpetrating the fraud on CTI through January 1982 by improperly providing special treatment of RDF checks drawn on nonexistent funds and by informing RDF on a daily basis of the amount needed to cover said checks.

---

[4]According to a subsequent audit, commissioned by CTI in preparation for trial, during the period from September 2, 1981 through February 5, 1982, RDF made 1,251 loans to Benny and issued $320,821,526 in checks to CTI. Of these checks, $19,245,926 were subsequently dishonored. CTI disbursed $320,057,601 directly to Benny for Benny's benefit. In excess of 96 percent of CTI's checks were recycled back to RDF by Benny to cover the checks RDF had written to CTI. This recycling was accomplished by Benny's endorsing CTI's checks and arranging for the CTI checks to be deposited in RDF's bank account, or by Benny purchasing cashier's checks with the CTI checks and delivering the cashier's checks to RDF for deposit in its bank account. The total amount of loss sustained by CTI was reported to be $16,899,032.

[5]The United States Supreme Court has explained the mechanics of check kiting as follows: "As the Government explains, a check-kiting scheme typically works as follows: 'The check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection. [¶] By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time. In effect, the check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks . . . .' " (*Williams* v. *United States* (1982) 458 U.S. 279, 281, fn. 1 [73 L.Ed.2d 767, 770-771, 102 S.Ct. 3088].) Consequently, the Bank takes the position that no check kite occurred in the instant case. The Bank reasons that a check kite is a species of fraud which is practiced on banks, not third parties as in this action. In addition, a check kite scheme is based on the fact that there are insufficient funds in any bank in the kite to cover the checks, whereas CTI's checks were always covered by sufficient funds.

Whether a true check kiting scheme existed here need not be decided by this court. The issues raised in the two writs may be adequately determined without reference to this issue.

As a result of this assistance, the Bank received in excess of $150,000 from RDF in overdraft charges.[6]

Finally, the complaint alleged that the Bank at no point informed CTI of the kiting activity in the RDF accounts. Moreover, during the operation of the fraudulent scheme, CTI was unaware of the fraud being perpetrated upon it and was unaware that the representations upon which it relied were false. Based on the above allegations, the complaint contained five causes of action, for fraud, conspiracy to defraud, breach of duty of good faith, wrongful dishonor of checks and for money had and received.

The Bank filed an answer setting forth 18 affirmative defenses. The most pertinent of these defenses were that 1) the Bank had made no representations to CTI; 2) there was no duty of disclosure running from the Bank to CTI; 3) to the extent that the complaint was based upon the fraud of Benny and RDF, CTI had no right of recovery by virtue of its own knowledge of and active involvement in the matters complained of; and 4) any damages incurred by CTI were proximately caused by and attributable to the acts of CTI, its agents and employees, and not the Bank.

In addition, the Bank filed a cross-complaint containing seven causes of action for fraudulent concealment, breach of fiduciary duty, conspiracy, negligence, breach of contract, breach of covenant of good faith and fair dealing and conversion. The gravamen of the Bank's claims against CTI was that a separate fraudulent scheme by Benny, in which CTI participated as escrow agent and title insurer, resulted in there being grossly inflated market values on the Diamond Heights condominiums from January 1979 through 1981. According to the cross-complaint a large number of purported buyers (strawmen), in conspiracy with Benny, CTI and others, received compensation from Benny for fronting as bona fide buyers through the close of escrow. They then reconveyed title to the condominium units to Benny, usually by quitclaim deed. The process of sale and reconveyance was often repeated, sometime more than once, for each unit. The purpose and object of the scheme was to obtain increasing amounts of purchase money financing on the units, to generate artificially high and false sales values on the units, and to lead lenders to believe that their loans on the units, which were in amounts in excess of the true market values, would be fully secured. The

---

[6]The $150,000 to which the complaint refers is based upon charges made by the Bank to the RDF account. According to employees of Bank, when a bank routinely allows a customer to cover its checks with noncash deposits, the bank will impose a "float charge" on the account, among other processing charges. Generally speaking, with a "float charge" (sometimes referred to as overdraft interest) the Bank charges a fee for the period of time between deposit of covering checks and collection.

Bank made purchase money loans to seven purported buyers or strawmen[7] on the condominiums and these loans were secured by first deeds of trust. However, when the empire of Benny collapsed in January or February of 1982, the purported buyers defaulted on the obligations owing to the Bank. Even though the units were released from bankruptcy, it became clear that resale of the units would not realize a sufficient amount of money to discharge the purchase money mortgages.

*Discovery Question*

During the course of discovery, the Bank deposed several of CTI's present and former employees, including James Straw, an attorney employed in CTI's San Francisco office as assistant regional counsel. The primary focus of the discovery proceedings was the participation of CTI's employee, James Fagerhaugh, in the alleged check kiting scheme and in other frauds perpetrated by Benny. At several depositions, and particularly that of Attorney Straw, the Bank's attorney posed various questions concerning communications that Straw had with other CTI employees. All CTI employee deponents were instructed not to answer such questions on the grounds that they violated the attorney-client privilege.

The Bank moved to compel answers, contending that 1) CTI had waived the privilege by suing the Bank on grounds to which the communications were relevant; 2) the dominant purpose of some of the communications was not to obtain legal advice; and 3) the communications were in aid of a crime or fraud (Evid. Code, § 956). The motion was referred to a discovery referee, who recommended that answers be compelled to 39 of the 52 disputed items.

Although the referee rejected the argument that Attorney Straw was consulted in order to facilitate a fraud, he found an implied waiver of the attorney-client privilege on the theory that "if probative information is held by a witness, such as Straw, which bears directly on the issue of whether or not the plaintiff herein had knowledge sufficient to avoid its losses, the cloak of the attorney-client privilege should be removed." The superior court adopted the recommendations of the referee "in toto insofar as they refer to the question of attorney-client privilege and the questions, et cetera, propounded to Mr. Straw." An order to this effect was then entered.

---

[7]One of the strawmen was CTI's senior escrow officer James A. Fagerhaugh who handled the RFD-Benny loans which were the basis of CTI's complaint. Fagerhaugh was later convicted of perjury and income tax evasion in the same proceeding that was brought against Benny by the federal government. (See fn. 2 *ante.*) In November 1982, CTI brought a complaint against its insurer which was based on the allegation that Fagerhaugh knew that the real purpose of the escrows on loans from RDF to Benny was to divert Chicago Title property to Benny. (See fn. 3, *ante.*)

The general rule applicable to the attorney privilege has been set forth by our Supreme Court. "The privilege authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client. (Evid. Code, § 950 et seq.) Clearly, the fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.] In other words, the public policy fostered by the privilege seeks to insure 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' [Citation.] [¶] Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship." (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 599 [208 Cal.Rptr. 886, 691 P.2d 642], as mod. 38 Cal.3d 63a, fn. omitted.)

■ However, the right to assert the attorney-client privilege is not absolute. Evidence Code section 912, subdivision (a) specifically provides that waiver of the privilege occurs when any holder of the privilege "has disclosed a significant part of the communication or has consented to such disclosure made by anyone." In addition, case law appears to indicate that the privilege may impliedly be waived. (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 604; cf. *Dickerson* v. *Superior Court* (1982) 135 Cal.App.3d 93, 99 [185 Cal.Rptr. 97].)[8] Such an implied waiver occurs where the plaintiff has placed in issue a communication which goes to the heart of the claim in controversy. In the case at bench no section 912 exception is present; thus, it must be determined whether CTI tendered an issue which constituted an implied waiver.

California courts have considered a limited number of implied waiver cases. In *Fremont Indemnity Co.* v. *Superior Court* (1982) 137 Cal.App.3d 554 [187 Cal.Rptr. 137], the plaintiff filed suit against his insurer to recover under a fire insurance policy and alleged bad faith refusal to settle the claim. As part of its discovery efforts, the defendant undertook to depose the plaintiff. Because the plaintiff had been indicted for arson, he did not appear for the deposition and asserted his constitutional privilege against self-incrimi-

---

[8] The apparent rationale for such a nonstatutory exception has been explained as follows: "[T]he Evidence Code does *not* create any exception to the lawyer-client privilege for the situation in which a client *tenders* an issue such as his lawyer's conduct or state of mind. But the Code does *not* bar the courts from creating by decisional law *new* exceptions to various privileges." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 40.3, p. 1467, italics in original.)

nation. The Court of Appeal ordered the plaintiff to appear for deposition or abandon the action. Quoting *Wilson* v. *Superior Court* (1976) 63 Cal.App.3d 825, 830 [134 Cal.Rptr. 130], the *Fremont* court reasoned that " 'the gravamen of [his] lawsuit is so inconsistent with the continued assertion of [a] privilege as to compel the conclusion that the privilege has in fact been waived.' " (*Fremont Indemnity Co.* v. *Superior Court, supra,* 137 Cal.App.3d at p. 559.)

In *Merritt* v. *Superior Court* (1970) 9 Cal.App.3d 721 [88 Cal.Rptr. 337], the plaintiff had previously obtained a judgment against a company for personal injuries. The plaintiff then sued the company's insurance carrier for bad faith refusal to settle within policy limits. The complaint alleged that counsel for the insurance company had so confused plaintiff's attorney as to disable plaintiff from settling the original action within policy limits. The insurance company sought discovery of certain communications by plaintiff's attorney during preparation of the second lawsuit. The *Merritt* court held that the attorney-client privilege had been waived by the plaintiff placing in issue the decisions, conclusions and mental state of his attorney. Since the plaintiff was necessarily forced to prove his case by reference to the mental state of his counsel, the insurance company was entitled to inquire into communications relating to that state. (*Id.,* at p. 730.)

Subsequent case law has distinguished *Merritt* "as being limited in its application to the one situation in which a client has placed in issue the *decisions, conclusions, and mental state* of the attorney who will be called as a witness to prove such matters." (*Estate of Kime* (1983) 144 Cal.App.3d 246, 259 [193 Cal.Rptr. 718], italics in original; *Schlumberger Limited* v. *Superior Court* (1981) 115 Cal.App.3d 386, 393 [171 Cal.Rptr. 413]; *Miller* v. *Superior Court* (1980) 111 Cal.App.3d 390, 394 [168 Cal.Rptr. 589]; *Lohman* v. *Superior Court* (1978) 81 Cal.App.3d 90, 98 [146 Cal.Rptr. 171]; see also *Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 605.)

Most recently, in *Mitchell* v. *Superior Court, supra,* plaintiffs filed a lawsuit against several defendants alleging contamination of the air and ground water in the vicinity of their homes resulting from defendants' use of dibromochloropropane (DBCP). One cause of action was for intentional infliction of emotional distress. During the course of discovery defendants sought information about the nature and content of any warnings plaintiff Mitchell received from her attorneys regarding the health effects of DBCP. Mitchell invoked the attorney-client privilege and refused to respond. Defendants moved to compel answers, contending that the questions were critical to the issues of emotional distress causation and that any privilege that existed had been waived. Our Supreme Court rejected the contention. Re-

lying on the cases cited above, the *Mitchell* court held that the state of mind of Mitchell's attorneys was not at issue and that the plaintiff had no need to prove her case by reference to the conclusions or mental state of her counsel. The court agreed with the plaintiff that a cause of action for intentional infliction of emotional distress had not put into issue her *attorneys'* state of mind; the real issues were *her* knowledge and state of mind, evidence of which might be ascertained directly from her, without an examination of the information on DBCP transmitted to her by her attorneys. (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d 591, 601.)

Given this guidance on the application of implied waiver to the attorney-client privilege, we turn now to the particular facts in the instant action. CTI's complaint includes causes of action for fraud and conspiracy to commit fraud. ■ Justifiable reliance is an essential element of any cause of action for fraud and conspiracy to commit fraud. (*Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 374 [122 Cal.Rptr. 732].) Further, detrimental reliance may be unreasonable in light of the plaintiff's intelligence and experience. (*Wagner* v. *Benson* (1980) 101 Cal.App.3d 27, 36 [161 Cal.Rptr. 516].) Plaintiff has therefore put in issue the question of its own knowledge concerning the events complained of. The problem present here is that the knowledge of a corporate entity can only be expressed through its employees. Thus, we must decide whether communications between CTI house counsel and other of its employees are discoverable to determine the knowledge of CTI with regard to the allegedly fraudulent scheme.

Preliminarily, we note that James Straw performed functions which are not typically those of either outside counsel or house corporate counsel. For instance, CTI attorneys, including Straw, were involved with quality control of escrow accounts. As part of this procedure Straw monitored the checks coming into and disbursed from the accounts. It is settled that the attorney-client privilege is inapplicable where the attorney merely acts as a negotiator for the client, gives business advice or otherwise acts as a business agent. (*Aetna Casualty & Surety Co.* v. *Superior Court* (1984) 153 Cal.App.3d 467, 475 [200 Cal.Rptr. 471] and cases cited therein.) Therefore, we confine our analysis to those situations where in-house counsel is acting in his legal capacity.

In *Upjohn Co.* v. *United States* (1981) 449 U.S. 383 [66 L.Ed.2d 584, 101 S.Ct. 677], the United States Supreme Court expanded the previous "control group test" and held that all confidential communications concerning the scope of their employment between corporate employees and the corporation's in-house counsel are covered by the attorney-client privilege. The court reasoned that the expansion of the privilege did not put the ad-

versary in any worse position. "The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney: [¶] '[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.' [Citations.]" (*Id.*, at pp. 395-396 [66 L.Ed.2d at p. 595], italics in original.)

Although *Upjohn* explains the scope of the attorney-client privilege in a corporate situation, it in no way alters the rules of waiver. Thus, cases subsequent to *Upjohn* recognize that the privilege still may be expressly or impliedly waived. (See, e.g., *In re John Doe Corp.* (2d Cir. 1982) 675 F.2d 482, 488; *United States* v. *Willis* (S.D.Iowa 1983) 565 F.Supp. 1186, 1204.)

 The case most pertinent to the case at bench with respect to the issue of implied waiver appears to be one from the State of New Jersey. In *United Jersey Bank* v. *Wolosoff* (1984) 196 N.J. Super. 553 [483 A.2d 821], defendant executed a mortgage note with plaintiff bank. Following a default on that obligation, defendant's attorney met with plaintiff's vice-president and in-house counsel in an effort to resolve questions concerning satisfaction of the debt. Defendant's counsel allegedly represented that defendant's only assets had been disclosed in certain income tax returns and defendant's interest in a particular corporation was worthless. Accordingly, the parties agreed to a settlement of less than one-quarter of the debt. Two years later plaintiff learned that during the settlement negotiations, and contrary to the representations that had been made during those negotiations, defendant's interest in the corporation was substantial and defendant owned other assets which had been undisclosed. As a result of this information, plaintiff instituted suit against defendant seeking rescission of the settlement agreement plus damages.

During discovery on the suit, defendant was advised that plaintiff would waive the attorney-client privilege with respect to documents prepared during the period of the settlement negotiations, since they were pertinent to the issue of whether plaintiff reasonably relied on the representations made by defendant's attorney. Nevertheless, defendant sought discovery of all confidential communications without regard to the period in which they took place. The trial court agreed and held that as a matter of law all such communications were to be disclosed because they might bear upon the question of reasonable reliance.

Relying on the New Jersey Supreme Court's decision in *Matter of Kozlov* (1979) 79 N.J. 232 [398 A.2d 882], the *Wolosoff* court first reiterated a tripartite test to determine whether the privilege must yield: "First, '[t]here must be a legitimate need . . . to reach the evidence sought to be shielded.' [Citation.] Second, '[t]here must be a showing of relevance and materiality of that evidence to the issue before the court.' [Citation.] Lastly, the party seeking to bar assertion of the privilege must show 'by a fair preponderance of the evidence including all reasonable inferences that the information [cannot] be secured from any less intrusive source.' [Citation.]" (*United Jersey Bank* v. *Wolosoff, supra,* 483 A.2d at p. 826.) The court recognized that the plaintiff's knowledge of the defendant's financial condition, at the peak of the settlement negotiations, would reveal the extent to which it relied upon the alleged misrepresentations. However, the court found the trial court's order too broad. It limited the lower court's order to "the release of only those documents which bear upon the extent to which plaintiff reasonably relied upon the representations allegedly made during the negotiation process." (*Id.,* at p. 828.)

From the record in the instant petition, there is no question regarding the need to know about CTI's awareness of the RDF-Benny transactions absent any alleged representations from Bank. CTI put this knowledge in issue by its claim of detrimental reliance. The only close concern is whether this information can be obtained without invading the attorney-client privilege.

In the present case, it is obvious that James Fagerhaugh was the CTI employee with the greatest knowledge of the RDF-Benny transactions. However, relying on section 2306 of the Civil Code,[9] CTI has taken the position that Fagerhaugh's knowledge and actions cannot be imputed to it. Aside from Fagerhaugh, attorney Straw had the most complete picture of Benny activities. Through the synthesis of both privileged and nonprivileged communications, as well as direct involvement as a corporate employee, Straw accumulated knowledge that cannot be discovered elsewhere. For instance, Straw was one of the signatories for CTI of an "Indemnity and Holding Agreement" dated June 27, 1980, between CTI and Benny. He was consulted when CTI first became aware that Fagerhaugh had purchased a condominium in Diamond Heights Village in October of 1980. Straw met with an FBI investigator and became aware of the criminal investigation of Benny before September 1981, the time CTI alleges the check kiting scheme began. Straw was also responsible for policy compliance. Because of his auditing of escrow accounts and his close interaction with CTI personnel in the Pine Street office, Straw was a unique witness and participant in CTI's awareness of and response to Benny activities. While some of the infor-

---

[9]All statutory references are to the Civil Code unless otherwise indicated.

mation held by Straw may be discoverable through questioning other CTI employees, no single or combination of other CTI employees had the integrated picture of what was occurring.

■ As previously stated, Straw's activities as a business agent are not protected by the attorney-client privilege. Moreover, given the peculiar surrounding circumstances in the case at bench, the protection of the privilege must be denied to Straw in his role of corporate counsel for two reasons. First, Straw's actions as CTI legal counsel were so intertwined with activities which were wholly business or commercial that a clean distinction between the two roles became impossible to make. This merging of business and legal activities jeopardizes the assertion of the attorney-client privilege, since the attorney and the client in effect have become indistinguishable. The second reason, which in part results from the first, is that Straw's dual role as both business agent and attorney provided him with the most comprehensive awareness of the RDF-Benny-Fagerhaugh relationship, both prior to and during the alleged fraud. Straw was the key CTI observer with regard to the multiple Benny escrows. The best place to test CTI's knowledge of Benny's previous activities and reliance on representations purportedly made by Bank is through Straw. By alleging detrimental reliance in its cause of action for fraud, CTI has placed its knowledge of the Benny transactions at issue. Clearly Straw, in his dual role of business agent and attorney, is the person who most thoroughly can attest to the knowledge of the corporate entity. Consequently, any attorney-client privilege existing between Straw and CTI must be deemed impliedly waived.

In so ruling, we do not intend to undermine the importance of preserving confidentiality in the attorney-client relationship, within a corporation as well as without. However, where, as here, CTI is essentially alleging that it detrimentally relied on purported representations by the Bank, it cannot shield its knowledge by raising the curtain of the attorney-client privilege. This is not to say that solely by bringing an action in fraud the attorney-client privilege disappears; nor are we asserting that the employment of in-house counsel, standing alone, erodes the privilege. We merely find that given the facts of this case, Straw's merger of business and legal functions, coupled with CTI's assertion of detrimental reliance, has resulted in the implied waiver of the attorney-client privilege. Accordingly, we find that respondent court correctly ruled that the privilege had been impliedly waived by CTI pleading causes of action in fraud.

*Summary Adjudication Question*

After the petition for writ of mandate to vacate the trial court's discovery order had been filed in this court, respondent court conducted hearings on

the Bank's motion for summary judgment, summary adjudication with respect to each cause of action and/or judgment on the pleadings. Thereafter, the trial court denied the Bank's motion for summary judgment, judgment on the pleadings and for summary adjudication on the conspiracy and wrongful dishonor of checks causes of action. However, the court granted the Bank's motion for summary adjudication as to three causes of action: fraud, breach of the duty of good faith and for money had and received. The court found there had been no showing of direct, indirect, express or implied fraudulent representations by the Bank; that, as a matter of law, there was no duty of good faith owed by the Bank to its noncustomer CTI; and there had been no showing that the Bank was not entitled to charge overdraft charges to the RDF account and, consequently, the Bank did not have and receive money belonging to CTI. After CTI petitioned this court for a writ of mandate to vacate the lower court's order granting the Bank's motion for summary adjudication,[10] we issued an order to show cause to hear argument so as to avoid trial and potential reversal. (*Coulter* v. *Superior Court* (1978) 21 Cal.3d 144, 148 [145 Cal.Rptr. 534, 577 P.2d 669].)

Sections 1572 and 1710[11] set forth the necessary elements of any action for fraud. Clearly, section 1572 is inapplicable to the present action, since there was no contract relationship between CTI and the Bank. Thus, CTI's cause of action for fraud must be considered within the context of section 1710.

■ The trial court ruled that no misrepresentation had been made by the Bank. Citing *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197 [197 Cal.Rptr. 783, 673 P.2d 660], *Mary Pickford Co.* v. *Bayly Bros., Inc.* (1939) 12 Cal.2d 501 [86 P.2d 102], *Younan* v. *Equifax, Inc.* (1980) 111 Cal.App.3d 498 [169 Cal.Rptr. 478],

---

[10]Although CTI's petition prays for vacation of the entire order, it presents arguments applicable to only the causes of action for fraud and breach of the duty of good faith. Accordingly, we consider any attack to the determination on the third course of action, for money had and received, to have been abandoned.

[11]Section 1572 provides in pertinent part: "Actual fraud, within the meaning of this Chapter consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; 3. The suppression of that which is true by one having knowledge or belief of the fact; . . . 5. Any other act fitted to deceive."

Section 1710 provides in part: "A deceit, within the meaning of the last section, is either: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; . . ."

and *Universal By-Products, Inc.* v. *City of Modesto* (1974) 43 Cal.App.3d 145 [117 Cal.Rptr. 525], CTI maintains that a misrepresentation may be implied by conduct. Plaintiff appears to be arguing that when the Bank repeatedly honored RDF's checks, it was impliedly representing that RDF had sufficient funds to cover the checks. The argument is without merit.

Although there appears to be a conflict between California and federal law as to whether a check constitutes a representation (compare *People* v. *Poyet* (1972) 6 Cal.3d 530, 536 [99 Cal.Rptr. 758, 492 P.2d 1150] ["Penal Code section 476a, . . . is directed at the specific representation, implicit in the making, drawing, uttering, or delivering of a check or draft, . . ."] with *Williams* v. *United States, supra,* 458 U.S. 279, 284-285 [73 L.Ed.2d 767, 773] ["a check is not a factual assertion . . . [and does] not . . . make any representation."]), this potential conflict need not concern us. It is clear that RDF, rather than the Bank, was responsible for whatever representations were presented through uttering checks.

■ Relying on *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285 [85 Cal.Rptr. 444, 466 P.2d 996] and *Wells* v. *John Hancock Mut. Life Ins. Co.* (1978) 85 Cal.App.3d 66 [149 Cal.Rptr. 171], CTI also contends that the Bank can be liable for fraud because it actively concealed the fact that RDF's checks were being covered by CTI's own funds. Both *Warner* and *Wells* held that a duty of disclosure arises in transactions which do not involve fiduciary or confidential relations where the facts are known by the defendant and the defendant knows they are not known or reasonably discoverable by the plaintiff. Reliance on these cases is misplaced. Both actions were based on the existence of a contract; in *Warner* the parties had entered into a construction contract and in *Wells* the plaintiff was the assignee of an insurance policy. As previously mentioned, no contract theory is available in this case.

However, section 1710, subdivision 3 also states that fraud may occur in the "suppression of fact, by one who is bound to disclose it." Consequently, we must determine whether there was any duty of disclosure running from the Bank to CTI.

Section 1203 of the California Uniform Commercial Code provides that "[e]very contract or duty within this code imposes an obligation of good faith in its performance or enforcement." Thereafter section 4103 of the California Uniform Commercial Code states in part, "The effect of the provisions of this division may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure." CTI maintains that these sections create for the Bank

a duty of good faith and an obligation to stop the perpetration of a fraud. As the trial court pointed out, there is an unfortunate dearth of California cases which interpret these statutes in the context of the circumstances before us.

In *Sun 'n Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920], an employee was embezzling funds from her employer by altering checks written by the employer, payable to the bank, and depositing them in her personal account at the bank. The employer brought suit against the bank seeking to recover the total amount of the checks on six alternative theories: one each based on mistake, fraudulent misrepresentation, negligence, and warranty against material alteration and two based on title warranties. The trial court sustained the Bank's demurrer most particularly on the ground that the bank, as payee, owed no duty to the plaintiffs which was breached.

Our Supreme Court reversed the judgment. With respect to the cause of action for negligence the court held that the bank owed a duty to the employer-drawer, even though the latter was not a customer of the bank. The court described the duty as "minimal" and "narrowly circumscribed: it is activated only when checks, not insignificant in amount, are drawn payable to the order of a bank and presented to the payee bank by a third party seeking to negotiate the checks for his own benefit." (*Sun 'n Sand, Inc.* v. *United California Bank, supra,* 21 Cal.3d at p. 695.) The negligence theory discussed in *Sun 'n Sand* is not applicable to the present case. CTI never stated a cause of action for negligence; rather, the first cause of action was for fraud and the third cause of action alleged that Bank breached its "duties of good faith owed to [CTI] including, but not limited to, duties imposed by California Commercial Code section 1203 and 4103."

Regarding *Sun 'n Sand*'s causes of action based on statutory warranties, the high court determined "that the statutory warranties of sections 3417 and 4207[12] are given to the drawer of a check; those sections clearly con-

---

[12]California Uniform Commercial Code section 3417 provides in relevant part: "(1) Any person who obtains payment or acceptance and any prior transferor warrants to a person who in good faith pays or accepts that

"(a) He has a good title to the instrument or is authorized to obtain payment or acceptance on behalf of one who has a good title; . . .

"(c) The instrument has not been materially altered, except that this warranty is not given by a holder in due course acting in good faith . . .

"(ii) To the drawer of a draft whether or not the drawer is also the drawee. . . ."

California Uniform Commercial Code section 4207 provides in relevant part: "(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith

template that a drawer has a direct right of action, and this result is consonant with the Code's important underlying policy of simplifying and modernizing the law governing commercial transactions." (*Sun 'n Sand, Inc.* v. *United California Bank, supra,* 21 Cal.3d 671, 683.) No similar warranties exist for the circumstances in the instant action. On their face both sections 1203 and 4103 of the Commercial Code clearly contemplate some type of contract or agreement between the parties. No such relationship exists here. We consequently find *Sun 'n Sand* and subsequent cases such as *E. F. Hutton & Co.* v. *City National Bank* (1983) 149 Cal.App.3d 60 [196 Cal.Rptr. 614] and *Joffe* v. *United California Bank* (1983) 141 Cal.App.3d 541 [190 Cal.Rptr. 443] of no use to CTI.

Finding no California cases directly on point to this case, the parties have drawn our attention to cases from other jurisdictions. The cases cited by CTI[13] are either inapposite or contrary to the company's position. The Bank relies on *Portage Aluminum Co.* v. *Kentwood Nat. Bank* (1981) 106 Mich.App. 290 [307 N.W.2d 761], *Mid-Cal Nat. Bank* v. *Federal Reserve Bank* (9th Cir. 1979) 590 F.2d 761 and *Citizens Nat. Bank* v. *First Nat. Bank* (Miss. 1977) 347 So.2d 964 for the proposition that a bank owes no duty to nondepositors outside of those specified by statute.

The most pertinent decision to this action, and the one upon which the trial court relied in part, is *Pa. Nat. Turf Club* v. *Bank of West Jersey* (1978) 158 N.J. Super. 196 [385 A.2d 932]. In that case Pennsylvania National Turf Club (Turf Club) established a check cashing service for owners and trainers who did business at its race track. Zeek, a trainer at the track, utilized this service by cashing checks drawn on his account at defendant Bank of West Jersey (bank). Zeek told the bank managers that he was engaged in a large business transaction and, based on this representation, the bank agreed to a special arrangement for the handling of Zeek's checks

---

pays or accepts the item that

"(a) He has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and . . .

"(c) The item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith . . .

"(ii) To the drawer of a draft whether or not the drawer is also the drawee; . . ."

[13]*Citizens State Bank* v. *Western Union Telegraph Co.* (5th Cir. 1949) 172 F.2d 950; *First Nat. Bank of Sikeston* v. *Transamerica Ins. Co.* (8th Cir. 1975) 514 F.2d 981; *Mid-Cal Nat. Bank* v. *Federal Reserve Bank, supra,* 590 F.2d 761; *General Acc. Ins. Co.* v. *Fidelity & Deposit Co.* (E.D.Pa. 1984) 598 F.Supp. 1223; *J. F. Braun & Sons* v. *First National City Bank of N.Y.* (1969) 32 App.Div.2d 749 [300 N.Y.S.2d 628]; *Oklahoma Nat. Bank* v. *Equitable Credit Finance Co.* (Okla. 1971) 489 P.2d 1331; (1977) 278 Ore. 417 [564 P.2d 685]; *First State Bank & Trust Co. of Edinburg* v. *George* (Tex. Cin.App. 1974) 519 S.W.2d 198; *Seinfeld* v. *Commercial Bank & Trust Co.* (Fla. 1981) 405 So.2d 1039.

whereby he would be permitted to cover the checks as they were presented on a daily basis. Each morning, Zeek would call the bank to determine the extent of his overdraft. He would then cash additional checks at Turf Club and deposit the money to cover the overdraft. When deposits ceased, the bank returned the checks that had been presented for payment. Summary judgment was entered against the bank on the ground that the bank's pattern of conduct in handling the account constituted negligence and bad faith.

The appellate court reversed the judgment on the ground of duty, reasoning as follows: "[T]he bank owed no general duty to Turf Club by way of warning or other notice, merely because the latter undertook to cash its depositor's checks, which turned out to be dishonored for insufficient funds. Beyond the duty relating to return of the instruments, the drawee bank therein had no duty arising out of a relationship to the holder of the checks which could turn into tort liability. In the absence of evidence of any agreement, undertaking or contract between plaintiff and defendant from which any special duty can be derived, the improper handling of the Zeek account cannot in the abstract serve as a stepping stone for liability to plaintiff." (*Pa. Nat. Turf Club* v. *Bank of West New Jersey, supra,* 385 A.2d at p. 936.)

We find the reasoning of the New Jersey court sound and consistent with the law in this state. The California Supreme Court has voiced its view that bank-account holders should be afforded reasonable expectations of privacy. "A bank customer's reasonable expectation is that, absent compulsion by legal process, the matters he reveals to the bank will be utilized by the bank only for internal banking purposes. Thus, we hold [depositor] had a reasonable expectation that the bank would maintain the confidentiality of those papers which originated with him in check form and of the bank statements into which a record of those same checks had been transformed pursuant to internal bank practice." (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 243 [118 Cal.Rptr. 166, 529 P.2d 590].) If, as CTI suggests, banks had a duty to reveal suspicions about their customers, they would violate their customers' right to privacy, not to mention be forced to act as the guarantor of checks written by the depositors. We refuse to recognize such a duty by banks to inform on suspicious customers, and we thereby avoid the loss of privacy, expense and commercial havoc that would result from such a holding.

Accordingly, we find that the trial court was correct in its determination that no representation had been made by the bank to CTI and that the bank owed neither a common law nor statutory duty of disclosure to CTI.

The alternative writs are discharged and the petitions for peremptory writs of mandate are denied. The stay heretofore imposed shall be dissolved upon finality of this opinion.

Kline, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied December 26, 1985, and petitioner's application for review by the Supreme Court was denied February 27, 1986.