**GENERAL AMERICAN LIFE INSURANCE COMPANY,**
Plaintiff–Appellant,

v.

**Lee CASTONGUAY, Jerry Fitzpatrick, Charles Kilmer, et al.; Alex G. Sieben,**
Defendants–Appellees.

No. 91–16072.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 20, 1992.

Decided Feb. 1, 1993.

Andrew W. Lafrenz, William R. Hill, and Michael D. Alexander, Donahue, Gallagher, Thomas & Woods, Oakland, CA, for plaintiff-appellant General American Life Ins. Co.

James A. Carter, Jay P. Hendrickson, and Karen T. Dutton, Hendrickson, Higbie & Carter, San Francisco, CA, for defendants-appellees Lee Castonguay, Jerry Fitzpatrick, Charles Kilmer, Royal Miller, Jr., Charles P. Niles, Glenn Cornelius, Morris Landy, Harold W. Beaune, James E. Burney, Richard Kane, individually and as trustees of the Northern California Motor Car Dealers Ass'n Trust Fund.

Mark T. Mitchell, McClintock & Quadros, San Mateo, CA, for defendant-appellee Alex G. Sieben.

Before KOZINSKI and THOMPSON, Circuit Judges, and von der HEYDT, District Judge.[*]

KOZINSKI, Circuit Judge:

The Northern California Motor Car Dealers Association Trust, an ERISA trust, is obligated by its contract with General American Insurance Company to reimburse General over four million dollars. Unfortunately, it looks like the trust will come up three million dollars short. We are faced with two questions: First, can General sue not only for breach of contract but also for fraud, based on misrepresentations the trust's agent allegedly made when he was negotiating an extension of the contract? And, second, are the trustees personally liable for the trust's obligations?

---

[*] The Honorable James A. von der Heydt, Senior United States District Judge for the District of Alaska, sitting by designation.

## I

The trust provides health and other benefits to participating car dealers and their employees. In March 1987, it bought an insurance policy from General, under which General was to pay part of the claims made by the trust's plan members. The trust was to pay the remainder, but if it couldn't, General would protect the plan members by paying on their behalf and then seeking reimbursement from the trust. This meant, of course, that if the trust were to become insolvent General might have to pay but not get paid back.

Aware of this risk, General took steps to protect itself. It drafted the agreement to let either party cancel on a month's notice; to let General periodically demand audited financial statements; and to let General cancel immediately if the trust didn't provide these statements. ER 21–22. General was, however, less vigilant in exercising these rights than in acquiring them. By the end of 1987, the trust was in deep trouble—an audit revealed it was $1.7 million in the red, SER 429—but General didn't realize this until Fall 1989. When General renewed the policy in Fall 1988, it didn't look at any financial statements. Instead, it relied on representations by Alexander Sieben (the trust's agent in the renewal negotiations) that the trust was solvent but that no financial statements were available, and on a document provided by Sieben listing only the trust's assets but not its liabilities.

When General finally realized the trust was insolvent, it canceled the policy and brought suit. It sued the trust for breach of contract, the trust and Sieben for fraud and negligent misrepresentation, and the trustees in their individual capacities under both theories. Defendants moved for partial summary judgment, and the district court entered final judgment for them on everything but the first claim. General appeals.

## II

To recover for fraud under California law, it's not enough that General have relied on Sieben's false statements. General's reliance must also have been reasonable in light of its "intelligence and experience." *Wagner v. Benson,* 101 Cal.App.3d 27, 36, 161 Cal.Rptr. 516, 522 (1980) (fraud); *see also Wilhelm v. Pray, Price, Williams & Russell,* 186 Cal.App.3d 1324, 1332–33, 231 Cal.Rptr. 355, 359 (1986) (negligent misrepresentation); *Chicago Title Ins. Co. v. Superior Court,* 174 Cal.App.3d 1142, 1151, 220 Cal.Rptr. 507, 513 (1985) (fraud); *Atari Corp. v. Ernst & Whinney,* 981 F.2d 1025, 1031, (9th Cir.1992) (both). Defendants were entitled to summary judgment if no rational trier of fact could find that General's reliance on the statements was reasonable.

General is a sophisticated insurance company which deals with large insurance transactions day in and day out. It knew to make the trust promise to provide audited financial statements on request, and it reserved the right to cancel the agreement on the spot if the trust failed to comply. ER 21–22. It knew the trust had an accountant—in fact, it was paying the accountant's fees, ER 266, presumably to make sure the trust's financial status would be well documented. It had the documents that established the trust, which required that the trust get annual financial audits. General could easily have checked Sieben's claim that the trust was solvent; any sensible business entity in its place would have done so. Indeed, any sensible business entity would have questioned Sieben's statement that this multi-million-dollar trust had no financial documents. The very absence of current financial data should have set off bells, and made General investigate more carefully before renewing the policy.

Often it's reasonable for one party to rely on the other's representations without verifying them. But this isn't a case where the relying party is ignorant or inexperienced, or views the other party as an expert. *See Hartong v. Partake, Inc.,* 266 Cal.App.2d 942, 966, 72 Cal.Rptr. 722, 737 (1968); *Hefferan v. Freebairn,* 34 Cal.2d 715, 719–20, 214 P.2d 386, 388–90 (1950). Neither is this a case where the other party's statements seem reasonable on their

face or are especially hard to check. *See Mariani v. Schonfeld,* 126 Cal.App.2d 187, 189–90, 271 P.2d 940, 942 (1954). Given General's sophistication, the amount of money at stake, the tell-tale danger signals that should have alerted General to the need for further investigation and the ease with which General could have discovered the truth, no rational jury could have found that General behaved reasonably. *See Atari Corp.,* 981 F.2d at 1032. The district court was correct in granting summary judgment to defendants on the fraud and negligent misrepresentation counts.

### III

A. General contends the trustees are personally liable for the three million dollar shortfall. By entering into the deal on the trust's behalf, General argues, the trustees bound themselves personally as well as binding the trust. Questions concerning a trustee's liability for a trust's debts are normally determined by state law. Here, this would be Cal.Prob.Code § 18000, which makes the trustees liable for contracts entered into before July 1, 1987, but not for those entered into later.[1]

■ But this is no ordinary trust. It's an employee benefit plan trust, and under ERISA "any and all State laws" are preempted "insofar as they ... relate to any employee benefit plan." 29 U.S.C. § 1144(a); *see also Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97–99, 103 S.Ct. 2890, 2900–2901, 77 L.Ed.2d 490 (1983). ERISA's preemption clause is one of the broadest ever enacted by Congress, *PM Group Life Ins. Co. v. Western Growers Assurance Trust,* 953 F.2d 543, 545 (9th Cir.1992), and it preempts even generally applicable laws, not just laws aimed exclusively at employee benefit plans, *see Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47–

48, 107 S.Ct. 1549, 1552–1553, 95 L.Ed.2d 39 (1987).

The difficulty is that ERISA doesn't preempt *all* generally applicable laws whenever they happen to affect an employee benefit plan. The Supreme Court has explained that much of state tort and contract law isn't preempted. *See Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 832–33, 108 S.Ct. 2182, 2186–87, 100 L.Ed.2d 836 (1988). Likewise, state law isn't preempted when an employee benefit plan acts as employer, *Shaw,* 463 U.S. at 97 n. 17, 103 S.Ct. at 2900 n. 17; *Lane v. Goren,* 743 F.2d 1337, 1339–40 (9th Cir. 1984), or as stockholder, *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1465–70 (5th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987). It's far easier to make "I know it when I see it" decisions in this field than to come up with a general rule, but we must nonetheless try.

■ The key to distinguishing between what ERISA preempts and what it does not lies, we believe, in recognizing that the statute comprehensively regulates certain *relationships:* for instance, the relationship between plan and plan member, between plan and employer, between employer and employee (to the extent an employee benefit plan is involved), and between plan and trustee. *See* J. Daniel Plants, Note, *Employer Recapture of ERISA Contributions Made by Mistake,* 89 Mich.L.Rev. 2000, 2017 (1991). Because of ERISA's explicit language, *see PM Group,* 953 F.2d at 545, and because state laws regulating these relationships (or the obligations flowing from these relationships) are particularly likely to interfere with ERISA's scheme, these laws are presumptively preempted.[2]

---

1. This isn't as clear-cut a question as it might seem: The original contract was signed in March 1987, but was renewed a year later. The answer would thus turn on whether the renewal amounted to a new contract.

2. Laws that "affect employee benefit plans in too tenuous, remote, or peripheral a manner," *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21, may not be preempted. Likewise, state laws

will not be preempted if ERISA itself indicates Congress didn't intend to displace them. *Mackey,* 486 U.S. at 830–40, 108 S.Ct. at 2185–91 (ERISA's failure to provide mechanisms for collecting judgments against trusts, coupled with necessity for such mechanisms, implies Congress didn't intend to preempt relevant state laws). The state law involved here, however, falls within neither of these exceptions.

But ERISA doesn't purport to regulate those relationships where a plan operates just like any other commercial entity—for instance, the relationship between the plan and its own employees, or the plan and its insurers or creditors, or the plan and the landlords from whom it leases office space. State law is allowed to govern these relationships, because it's much less likely to disrupt the ERISA scheme than in other situations. Moreover, if these relationships were governed by federal law, federal courts would have to invent a federal common law of contracts, torts, property, corporations—something that would run against the grain of our federal system. *Cf., e.g.,* Federal Tort Claims Act, 28 U.S.C. § 2674 (incorporating state law for torts committed by the federal government, rather than creating a federal law of torts).

To determine whether a state law is preempted we must look at whether it encroaches on the relationships regulated by ERISA. State tort and contract causes of action, for instance, don't apply to transactions between plans and their participants, *see, e.g., Pilot Life,* 481 U.S. at 47–48, 107 S.Ct. at 1552–1553, because the relationship between plan and participant is, under ERISA, a matter of exclusively federal concern, *FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990). Wrongful discharge laws don't apply to employee terminations carried out to avoid benefit payments, because the employer-employee relationship is—insofar as it deals with benefit plans—also an exclusively federal matter. *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990). State law can, however, apply to transactions between plans and their creditors or their landlords or their own employees, because those relationships are outside ERISA's purview.

B. Under this approach, the first question we must ask is whether the state law reaches a relationship that is already regulated by ERISA. It doesn't matter whether the state law regulates the relationship directly (by telling the parties what they can or cannot do), or indirectly (by imposing on the parties extra duties that flow from their conduct in this relationship). Any regulation of the relationship is basis enough for preemption.

Here, the state law subjects trustees to personal liability on account of things they do in discharging their responsibility to the trust. ERISA already regulates the trust-trustee relationship: For instance, it gives the trustees the authority to control and manage the plan, 29 U.S.C. § 1102, imposes on them a fiduciary duty to the plan's beneficiaries, 29 U.S.C. § 1104, demands that they avoid certain conflicts of interest, 29 U.S.C. §§ 1106–1107, and makes them personally liable to the plan for breach of fiduciary duty, 29 U.S.C. § 1109. And Cal. Prob.Code § 18000 certainly regulates this relationship, because it imposes an extra burden on trustees by virtue of their part in the relationship. This burden affects the trustees' conduct just as surely as direct regulation would; a trustee exposed to additional personal liability for his acts as trustee may act much more timidly than one who's immunized from such liability.[3] Moreover, adding to the trustees' personal obligations can make it harder for plans to find qualified trustees, who may be frightened away by the specter of personal liability. *See* n. 8 *infra.*

Because the state law here regulates one of the relationships regulated by ERISA, we must give effect to ERISA's broad preemption clause.[4] The liability of the trustees in this case must be governed by federal, not California, law.

C. Having determined that the personal liability of trustees must be governed by a

---

**3.** This is especially true when the trust operates in many states and might therefore be exposed to many different state laws. *See PM Group,* 953 F.2d at 547.

**4.** The state law also regulates the trustee-creditor relationship, a relationship that's outside

ERISA's scope. This, however, isn't a reason against finding preemption: A law is preempted if it regulates any of the relationships regulated by ERISA, regardless of whether it also regulates other relationships with which ERISA isn't concerned.

federal rule, we must next determine the content of this rule. ERISA itself doesn't contain such a rule, but that simply means federal courts must create it as a matter of federal common law. *Pilot Life Ins. Co.*, 481 U.S. at 56, 107 S.Ct. at 1557; *PM Group*, 953 F.2d at 546; *see also* Larry Kramer, *The Lawmaking Power of the Federal Courts*, 12 Pace L.Rev. 263, 270 (1992). It's our job to examine the ERISA statutory scheme and the policy judgments it embodies, and come up with a rule that best comports with them.[5]

One of the key principles underlying ERISA is that trustees must be devoted *solely* to the interest of plan beneficiaries.[6] 29 U.S.C. § 1104(a)(1); *cf.* 29 U.S.C. §§ 1106, 1107 (banning certain transactions that might cause a conflict of interest for trustees); 29 U.S.C. § 1109(a) (imposing personal liability for breach of fiduciary duties to plan beneficiaries). Trustees may not put anybody's interests ahead of the beneficiaries'—not their own interests, and not the interests of the trust's creditors. If it's in the beneficiaries' interest to breach a contract the trustees must feel free to breach it;[7] if it's in the beneficiaries' interest to enter into a contract that the trust might later have to breach, the trustees must have the latitude to do so.

Requiring trustees to personally guarantee the trust's obligations would seriously distract them from their duties. For instance, trustees may be reluctant to delegate authority to a competent agent—even if doing so would be in the beneficiaries' best interest—because the agent might take actions that could bind the trustees personally. Likewise, when a trust is skating close to the financial edge, the trustees' fear of personal liability may keep them from doing what's necessary to get the trust on its feet again.[8]

This case illustrates the problem. All along, General has wanted the trustees to order member dealerships to contribute enough to make the trust solvent again. The agreement setting up the trust gives this power to the trustees, ER 108, 112, 115, but under ERISA they may exercise it only if it's in the beneficiaries' best interest.[9] But if the trustees were indeed personally liable under the contract, they'd be under immense pressure to get themselves off the hook by forcing the dealerships to pay up, regardless of the beneficiaries' interest. This is precisely the sort of divided loyalty ERISA is meant to prevent. Outside pressure leading trustees to consider anyone's interest other than that of the beneficiaries seriously undermines ERISA's core principles.[10]

---

**5.** In some situations, federal courts absorb state law as the appropriate federal rule of decision instead of creating a uniform federal rule. *PM Group*, 953 F.2d at 546. But this makes little sense when we deal with a comprehensive regulatory statute that expressly preempts state law, and that seeks to impose a uniform nationwide scheme. *Id.; see also* Plants, 89 Mich.L.Rev., at 2027–28.

**6.** We use "beneficiaries" to refer both to beneficiaries and plan participants. Trustees owe their fiduciary duty to both. 29 U.S.C. § 1104(a)(1).

**7.** Of course, the trust would still be liable for damages, but in some cases it would be in the beneficiaries' best interest to breach and pay the piper rather than incur the cost associated with avoiding a breach. *See, e.g.*, Richard A. Posner, Economic Analysis of Law 108–09 (3d ed. 1986) (discussing efficient breaches).

**8.** Personal trustee liability can also interfere with the operation of benefit plans by making it harder to find people willing to serve as trust-

ees. *See* Declaration of Charles Kilmer, SER 442, ¶ 5; Declaration of Lee Castonguay, SER 444, ¶ 5.

**9.** For instance, if ordering the employers to pay might cause them serious financial harm, the trustees could conclude that such an order would be against the employees' interests as well, *see Morse v. Stanley*, 732 F.2d 1139, 1146 (2nd Cir.1984).

**10.** Of course, a state could decide that trustees should owe a duty both to the trust's beneficiaries and to the trust's creditors; personal liability for a trust's contracts would then be a reasonable idea. But reasonable as this might be for state law trusts, it cannot apply to trusts regulated by ERISA, under which the trustee's *only* duty is to the beneficiaries.

We also note that the recent trend in state law has been towards abolishing personal trustee liability. *See Cal.Prob.Code.* § 18000 (no personal liability on contracts entered into after 1987); Uniform Probate Code § 7–306, 8 U.L.A. 1, 560 (no personal liability); Alaska Stat. § 13.-

1524

We therefore hold that, as a matter of federal law, ERISA plan trustees can't be held personally liable for the trust's contracts. The district court correctly dismissed the defendant trustees in their individual capacities.

AFFIRMED.

36.095; Ariz.Rev.Stat.Ann. § 14–7306; Colo.Rev. Stat. § 15–16–306; Ga.Code.Ann. § 53–12–199; Idaho Code § 15–7–306; Ind.Code § 30–4–3–10; Ky.Rev.Stat.Ann. § 386.730; Me.Rev.Stat.Ann. tit. 18–A, § 7–306; Mass.Gen.Laws Ann. ch. 203, § 14A; Mich.Comp.Laws Ann. § 700.818; Mont. Code Ann. § 72–36–101; Neb.Rev.Stat. § 30–2817; N.M.Stat.Ann. § 45–7–306; N.D.Cent. Code. § 30.1–34–06; Ohio Rev.Code Ann. § 1339.65; Okla.Stat.Ann. tit. 60, § 174; S.C.Code Ann. § 62–7–306; Utah Code Ann. § 75–7–306.