[No. D040094. Fourth Dist., Div. One. Mar. 4, 2003.]

GUADALUPE T. BENITEZ, Plaintiff and Appellant, v.
NORTH COAST WOMEN'S CARE MEDICAL GROUP, INC., et al.,
Defendants and Respondents.

**COUNSEL**

Law Office of Albert C. Gross and Albert C. Gross for Plaintiff and Appellant.

Stroock & Stroock & Lavan, Lisa M. Simonetti, Heather A. McConnell; Jennifer C. Pizer and Phillip Mendelsohn for Lambda Legal Defense and Education Fund, Inc., California Women's Law Center and National Health Law Program as Amici Curiae on behalf of Plaintiff and Appellant.

DiCaro, Coppo & Popcke, Carlo Coppo and Gabriele M. Prater for Defendants and Respondents.

Brad W. Dacus and Roger G. Ho for Pacific Justice Institute as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

McDONALD, J.—In this case we hold that state claims are not preempted by the Employee Retirement Income Security Act (ERISA) if the claims are against a non-ERISA entity medical services provider for declination to provide medical treatment to an ERISA plan participant for nonmedical reasons other than plan eligibility or plan administration considerations.

Appellant Guadalupe T. Benitez's complaint against respondent doctors and their employer alleged that the doctors treated her for infertility for an 11-month period, but then refused to provide her with additional infertility treatments because of her sexual orientation. She sought damages and injunctive relief against respondents under various state statutory and common law theories. Respondents demurred to the complaint, asserting that because Benitez received her infertility treatments under an employee health benefit plan, her state claims were preempted by ERISA. The trial court sustained the demurrer without leave to amend and dismissed Benitez's complaint.

We reverse because we conclude ERISA does not preempt the state claims alleged by Benitez.

I

FACTUAL AND PROCEDURAL BACKGROUND

■ Because this matter is before us from a judgment of dismissal following the sustaining of a demurrer without leave to amend, our factual background accepts as true the facts alleged in the complaint, together with facts that may be implied or inferred from those expressly alleged. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].) We do not accept as true contentions or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Our factual recitation is largely derived from Benitez's first amended complaint.

## A. *The Parties*

Benitez was employed by Sharp Mission Park and, as a benefit of her employment, was enrolled in the Sharp Health Plan. Respondent North Coast Women's Care Medical Group, Inc. (NCWC) contracted with Sharp Mission Park/Sharp Health Plan (Sharp) to provide obstetrical and gynecological services to Sharp participants, including Benitez, who lived in North San Diego County. Respondents Drs. Christine Brody and Douglas Fenton, both of whom are licensed medical doctors specializing in obstetrics and gynecology, were employed by NCWC.

## B. *The Alleged Misconduct*

Benitez began receiving infertility treatments from NCWC and Brody in August 1999 and continued receiving treatment for the next 11 months, including the period during which Benitez was a participant in Sharp. Benitez told Brody that Benitez was lesbian but asked Brody to keep this information confidential. Brody agreed not to include any reference to Benitez's sexual orientation in her chart.[1] Brody told Benitez that Brody had religious-based objections to treating homosexuals to help them conceive children by artificial insemination, but nevertheless agreed to provide her fertility-related medical services, and there would be no problem for another NCWC physician to perform artificial insemination.

During the next eight months, Benitez took oral fertility drugs and, under Brody's instructions, attempted intravaginal insemination at home with donor sperm. These efforts were unsuccessful, and in April 2000 Brody performed laproscopic surgery on Benitez as a prerequisite to intrauterine artificial insemination (IUI). During the week of May 15-19, 2000, Benitez twice visited NCWC for monitoring and preparation for the IUI. On the second visit, Brody told Benitez "We're ready to go," and then left the examination room to make arrangements for another physician to perform the IUI. However, when Brody returned she stated she had "bad news": California required a "tissue license" to inseminate known-donor sperm, and NCWC did not have that license. Accordingly, instead of receiving the IUI scheduled for the following day, Benitez was instructed to again attempt intravaginal insemination.

On July 5, 2000, Benitez visited Brody and received a negative pregnancy test. Brody encouraged Benitez to make arrangements for the IUI, and was

---

[1] Benitez's complaint alleged Brody violated this promise of confidentiality by noting on Benitez's chart that Benitez "has been with her current partner for [eight] years. They require donor sperm . . . she has never been with a male partner."

told to inform Brody as soon as Benitez's menstrual cycle resumed so Benitez could timely resume taking clomid (a fertility drug). On July 7, 2000, Benitez's menstrual cycle began and she telephoned NCWC to obtain a refill of her clomid prescription. The receptionist told Benitez that Brody was on vacation and that Benitez's request would be relayed to Brody's colleague, Fenton. However, Benitez later received a telephone call from "Shirley" at NCWC who stated she was sorry but Fenton would not be able to help Benitez with the procedure or to authorize Benitez to refill the prescription. Benitez demanded to speak to Fenton. Benitez later received a telephone call from Fenton, who stated that because of the beliefs held by Brody and other unidentified members of the staff, he would be unable to help Benitez. He explained that Brody and some of her staff were uncomfortable with Benitez's sexual orientation and that, because of their beliefs, Benitez would not be treated fairly at NCWC and would not receive timely care from staff members holding those beliefs.

On August 8, 2000, Benitez filed a complaint with the California Department of Fair Employment and Housing (DFEH). Brody apparently learned of the complaint because she contacted Benitez and tried to convince her to drop the complaint, telling her it was ruining Brody's career, causing her stress, and making it difficult for her to work. When Benitez told Brody that Fenton could have performed the procedure because he said he had no objection to treating homosexuals, Brody replied in essence that Fenton would not have said he had no problem because he attended the same church as did Brody. Thereafter, Benitez asked a DFEH investigator to inform Brody not to contact her further.

Benitez obtained authorization from Sharp to obtain infertility treatment from Dr. Kettel, an "off-plan" physician.[2] Dr. Kettel performed several IUI's on Benitez, which did not result in pregnancy, and thereafter performed in vitro fertilization that succeeded in impregnating Benitez.

C.   *The Trial Court Proceedings*

On July 5, 2001, Benitez filed her complaint, which alleged 10 claims against respondents: violation of the Unruh Civil Rights Act (hereafter Act), breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, deceit and fraud, tortious interference with prospective advantage, and invasion of privacy. Respondents filed a general demurrer to the complaint on the sole ground that

---

[2]The use of an off-plan physician caused Benitez to incur considerable extra expense. Additionally, NCWC apparently refused to release certain records to Benitez's new physician.

Benitez's claims arose from and directly related to her employee health benefit plan and were therefore preempted by ERISA. The court sustained the demurrer with leave to amend.

Benitez then filed her first amended complaint, which added the allegation that respondents were not ERISA "entities," and reasserted the same 10 claims against respondents.[3] Respondents again demurred, asserting that the gravamen of her claims was that respondents improperly refused to provide her with medical services available under her employee health benefit plan, and therefore her claims were preempted by ERISA regardless of whether she mentioned her employee health benefit plan in her claims. The court sustained the demurrer without leave to amend, dismissed Benitez's complaint and entered judgment in favor of respondents.[4] Benitez timely appealed.

## II

### ANALYSIS

■■■ The issue is whether Benitez's state law claims against respondents are preempted by federal law because they *relate to* an employee benefit plan subject to ERISA. Respondents argue the claims are preempted because they are rooted in respondents' decision to deny Benitez benefits to which she is entitled under an ERISA plan. Benitez argues ERISA preemption applies only when the state law claims are based on the denial of ERISA benefits and made against defendants whose actionable conduct occurred while acting in an ERISA capacity, and neither predicate to preemption is present here.

### A. *The ERISA Scheme and Preemption*

ERISA is a comprehensive federal law designed to promote the interests of employees and their beneficiaries in employee pension and benefit plans. (*Shaw v. Delta Air Lines, Inc.* (1983) 463 U.S. 85, 90 [103 S.Ct. 2890, 2896, 77 L.Ed.2d 490].) As a part of this integrated regulatory system, Congress enacted various safeguards to preclude abuse and to secure the rights and

---

[3]Benitez also included a claim against Sharp for recovery of benefits under 29 United States Code section 1132. Benitez settled her claims against Sharp in December 2002 and the court approved the settlement of those claims.

[4]Respondents also filed a motion to strike the complaint under the so-called SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16), but the court did not rule on the SLAPP motion because dismissal of the complaint made the SLAPP motion moot.

expectations that ERISA confers. (29 U.S.C. § 1001.) A prominent safeguard under ERISA is 29 United States Code section 1144(a) (hereafter section 514), an expansive preemption provision that preempts " 'any and all State laws insofar as they . . . relate to any employee benefit plan . . . .' " (*Ingersoll-Rand Co. v. McClendon* (1990) 498 U.S. 133, 138-139 [111 S.Ct. 478, 482, 112 L.Ed.2d 474].)

In *Shaw v. Delta Air Lines, Inc., supra*, 463 U.S. 85, 96-99 [103 S.Ct. 2890, 2899-2901], the United States Supreme Court construed ERISA's preemption clause expansively by interpreting the "relates to" language as preempting any claim under state law that has a "connection with or reference to" an employee benefit plan governed by ERISA. However, more recent decisions of the United States Supreme Court have narrowed the preemptive scope of ERISA. In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645, 655 [115 S.Ct. 1671, 1677, 131 L.Ed.2d 695] (*Travelers*), the court recognized that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere,' H. James, Roderick Hudson xli (New York ed., World's Classics 1980)." The *Travelers* court stated, "[o]ur past cases have recognized that the Supremacy Clause, U.S. Const., Art. VI, may entail pre-emption of state law either by express provision, by implication, or by a conflict between federal and state law. [Citations.] And yet, despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." (*Id.* at p. 654 [115 S.Ct. at p. 1676].) *Travelers*, recognizing that the limiting phrase, "insofar as they . . . relate to," contained in section 514, "does not give us much help" in delineating the limitations of ERISA preemption (*Travelers*, at p. 655 [115 S.Ct. at pp. 1676-1677]), decided that it must look "beyond the unhelpful text" of section 514 and "look instead to the objectives of the ERISA statute" (*Travelers*, at p. 656 [115 S.Ct. at p. 1677]) to assure that the phrase "relate to" is considered practically and not stretched indeterminately. (*Id.* at p. 655 [115 S.Ct. at pp. 1676-1677].) Accordingly, *Travelers* developed new tests narrowing the scope of ERISA preemption of state laws.[5]

*Travelers* concluded that ERISA preempts only those state laws having a connection with or reference to employee benefit plans that affect the nature

[5]Because *Travelers* reconfigured the approach for determining whether claims arising under state statutory or common law are preempted by ERISA, decisions predating *Travelers* and applying the *Shaw* approach to preemption must be "reevaluated in light of *Travelers'* dictates" (*Southern Calif. IBEW-NECA Trust Funds v. Standard Indus.* (9th Cir. 2001) 247 F.3d 920, 927) and provide little guidance to current cases.

of the plans and the objectives of ERISA. (*Travelers, supra,* 514 U.S. at p. 656 [115 S.Ct. at p. 1677].) *Travelers* noted that the objective of Congress in passing ERISA was to insure national uniformity in the *administration* of the employee benefit plans it covers. (*Id.* at pp. 656-657 [115 S.Ct. at pp. 1677-1678]; accord, *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.* (1997) 519 U.S. 316, 325-330 [117 S.Ct. 832, 837-840, 136 L.Ed.2d 791].) Accordingly, *Travelers* sought to avoid pre-emption of state laws having only a " 'tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability.' " (*Travelers,* at p. 661 [115 S.Ct at p. 1680].) By narrowing the scope of ERISA preemption to state laws that interfere with national uniformity in the administration of the employee benefit plans, *Travelers* sought to enforce the legislative purpose of ERISA without unnecessarily infringing on matters subject to traditional state regulation.

In *Pegram v. Herdrich* (2000) 530 U.S. 211 [120 S.Ct. 2143, 147 L.Ed.2d 164], the court considered the obverse issue: whether ERISA *created* a federal claim for breach of fiduciary duty against a medical practitioner whose treatment decisions, traditionally actionable under state malpractice law, had the incidental effect of granting or denying a patient the benefits of medical treatment under an ERISA plan. The court distinguished pure "eligibility decisions" (which depend on the plan's coverage of a particular condition or procedure) from pure "treatment decisions" (which are those medical determinations of the appropriate response to the patient's condition) (*id.* at p. 228 [120 S.Ct. at pp. 2153-2154]), and concluded that ERISA regulates claims based on pure unmixed eligibility decisions but was not intended to "federalize malpractice litigation." (*Id.* at pp. 230, 234-236 [120 S.Ct. at pp. 2155, 2157-2158].) Under *Pegram* the scope of ERISA preemption is not determined by whether the conduct of a person employed to provide services under a plan has adversely affected a plan beneficiary's interests, but instead is whether the conduct was an eligibility/administrative decision regulated by ERISA.

B.  *Benitez's Claims Are Not Preempted by ERISA*

Benitez's Act and common law claims are based on the allegation that respondents refused to provide her medical treatment for reasons unrelated to her eligibility for that treatment under her ERISA plan. In closely analogous contexts, courts in other jurisdictions have concluded that under *Travelers* state law claims against medical practitioners based on omissions or commissions unrelated to plan-based eligibility or administrative determinations are not preempted by ERISA even though the patient was referred to the physician under an ERISA plan.

In *Pryzbowski v. U.S. Healthcare, Inc.* (3d Cir. 2001) 245 F.3d 266, the plaintiff was a patient enrolled in a health maintenance organization (HMO) under an ERISA plan. She sought treatment from her primary care provider (the PCP), who had contracted with the HMO to provide medical services to the HMO's participants. She suffered injuries as the result of delay in approving treatment by an off-plan physician, and she sued (1) the HMO for delaying the authorization and (2) the PCP for (in essence) medical malpractice. The court concluded that, under *Pegram v. Herdrich, supra,* 530 U.S. 211, the preemption analysis must distinguish claims involving improper handling of "eligibility decisions" from claims involving improper "treatment decisions." The former type of claim challenges the administration of or eligibility for benefits under an ERISA plan and is therefore subject to ERISA preemption. However, the latter class of claims contests the quality of the treatment and may be the subject of a claim under state law. (*Pryzbowski,* at p. 273.) *Pryzbowski* concluded the plaintiff's claim against the HMO was preempted because it involved mishandling of an eligibility decision. (*Id.* at pp. 273-275.) However, *Pryzbowski* concluded the claims against the PCP, which challenged the quality of care rendered by the PCP, were not preempted by section 514. (*Pryzbowski,* at pp. 278-281.)

A similar rationale was applied in *Roach v. Mail Handlers Ben. Plan* (9th Cir. 2002) 298 F.3d 847, in which the court evaluated a preemption statute (5 U.S.C. § 8902(m)(1)) containing language analogous to ERISA's preemption language. The issue in *Roach* was whether a state law malpractice claim against a preferred provider was preempted. The *Roach* court, relying on the rationales articulated in *Travelers* and *Pegram,* as well as the statement in *Rush Prudential HMO, Inc. v. Moran* (2002) 536 U.S. 355 [122 S.Ct. 2151, 153 L.Ed.2d 375] that there is a presumption against a congressional intent to preempt "the quintessentially state-law standards of reasonable medical care" (*Id.* at p. 387 [122 S.Ct. at p. 2171]), reasoned that the courts have "created a divide between claims based on a denial of benefits, which are preempted, and claims based on medical malpractice, which are not. [Citations.] We believe this division protects the federal interest of uniformity of . . . plan interpretation and preserves the traditional state interest in the quality of medical care. Accordingly, we hold that denial of benefit claims are preempted . . . but malpractice claims are not." (*Roach,* at p. 850.) The *Roach* court also rejected the defendants' argument that preemption applied merely because the plaintiff's "malpractice claim references her benefit plan in explaining why [the plaintiff] contacted the [defendant medical practitioner]. But referencing the existence of a benefit plan in a state law claim— without more—does not endanger the uniform interpretation of that plan. [Citations.]" (*Id.* at p. 851.)

Finally, in *Bui v. American Telephone & Telegraph Co., Inc.* (9th Cir. 2002) 310 F.3d 1143, the plaintiff alleged a claim for malpractice against a medical provider hired by his employer's plan to provide emergency medical services. The court held ERISA preemption turns on the gravamen of the defendant's conduct. If the actionable conduct is the denial of benefits based on administrative decisions, ERISA preemption applies; if the claim alleges other conduct, state standards are not preempted. (*Id.* at p. 1149.) *Bui* specifically considered a claim against the medical provider based on the failure to provide a covered service (emergency evacuation) in a timely manner. The court concluded that if the *reason* the service was not provided was because of administrative-related delays, ERISA would preempt the claim, but if the failure to provide the service was based on decisions made by the service provider in its medical capacity, ERISA would not preempt the claim. (*Id.* at pp. 1150-1151.)

These cases reflect an emerging recognition that ERISA plans do not provide medical treatment, but instead provide employees with economic benefits in the form of coverage for all or part of the costs of treatment. Because ERISA regulates the administration of benefits under its plans, but does not purport to federalize the law governing relationships among every person who might ultimately receive payments from a plan, preemption is presumed to be limited to those claims in which the gravamen of the conduct involves administrative decisions concerning plan benefits, while preserving to state law those claims involving conduct other than the administrative decisions concerning plan benefits.[6]

Employing this test, Benitez's claims against respondents are outside the limited scope of ERISA preemption. Respondents denied Benitez medical treatment, not the economic benefits available under the plan. More importantly, the complaint alleges respondents denied Benitez treatment for religious or other reasons, rather than for plan-based eligibility reasons, which is conduct not regulated by ERISA. The denial of treatment in this case, although not based on medical reasons, is more akin to a claim of medical malpractice rather than a claim of plan ineligibility or administration.

Respondents' contrary arguments are unpersuasive. Respondents argue that cases such as *Pryzbowski* stand for the proposition that claims based on medical decisions are excepted from preemption, but preemption remains applicable when a patient is denied treatment for nonmedical reasons. This

---

[6]The state courts have also apparently embraced this dichotomy. (See, e.g., *State Bd. of Reg. for Healing v. Fallon* (Mo. 2001) 41 S.W.3d 474.)

argument inverts the rationale of *Pryzbowski, Roach* and *Bui.* Those cases, after recognizing the presumption against preemption, held that preemption is limited to plan-based eligibility or administrative decisions because that is conduct regulated by ERISA, and medical decisions are conduct outside the intended scope of ERISA preemption. They did not hold medical decisions are *the only type* of conduct exempted from ERISA preemption. (Cf. *Dishman v. UNUM Life Ins. Co. of America* (9th Cir. 2001) 269 F.3d 974, 982 [invasion of privacy claim not preempted].) Respondents also cite a series of cases purporting to hold that claims under state consumer protection statutes or state common law are preempted. However, many of those cases predate *Travelers* and *Pegram* and provide little guidance to the instant case.[7] (See fn. 5, *ante.*) More importantly, the cases postdating *Travelers* (and many of those predating *Travelers*) are inapposite because the plaintiffs sought recovery from parties to the ERISA plan (see pt. C., *post*) based on conduct frustrating the plaintiff's ability to collect benefits allegedly due under the plan.[8] In contrast, Benitez's claim against Sharp for benefits (the economic subsidy for her medical care) is largely irrelevant to whether respondents engaged in actionable conduct toward Benitez.

We conclude that ERISA preemption does not apply to the failure to treat claims alleged by Benitez because they are not based on plan eligibility or plan administration even though they are based on nonmedical considerations.

---

[7]The cases relied on by respondents that predate *Travelers* include cases holding that preemption barred claims under state statutes (see *Felton v. Unisource Corp.* (9th Cir. 1991) 940 F.2d 503] [claim alleging violation of Arizona's civil rights law]; *Stone v. Travelers Corp.* (9th Cir. 1995) 58 F.3d 434 [Fair Employment and Housing Commission claim]; *Van Camp v. AT&T Information Systems* (E.D.Mich. 1991) 772 F.Supp. 980 [age/sex discrimination claim under Michigan civil rights laws]; and *Pervel Industries v. State of Conn., Etc.* (D.Conn. 1978) 468 F.Supp. 490 [pregnancy discrimination claim under Connecticut statute]), as well as cases holding that state common law claims were preempted (see, e.g., *Lea v. Republic Airlines, Inc.* (9th Cir. 1990) 903 F.2d 624; *Tingey v. Pixley-Richards West, Inc.* (9th Cir. 1992) 953 F.2d 1124).

[8]The post-*Travelers* cases cited by respondents held that ERISA preempted an employee's state law claims insofar as they sought recovery of ERISA regulated benefits as against an employer, a plan, or a plan administrator. (See *Bast v. Prudential Ins. Co. of America* (9th Cir. 1998) 150 F.3d 1003, 1007-1008 [claim against plan administrator for misconduct as administrator in delaying authorization for covered benefit held preempted]; *Hull v. Fallon* (8th Cir. 1999) 188 F.3d 939, 942-943 [preemption applies where gravamen of claim is defendant's failure as plan administrator to authorize payment for treatment]; *Thompson v. Gencare Health Systems, Inc.* (8th Cir. 2000) 202 F.3d 1072, 1073-1074 [preemption where claim is against plan administrator for wrongfully denying benefit]; *Andrews-Clarke v. Travelers Ins. Co.* (D. Mass. 1997) 984 F.Supp. 49 [same]; *Callison v. Charleston Area Medical Center, Inc.* (S.D. W. Va. 1995) 909 F.Supp. 391 [claim against employer seeking disability and fringe benefits under plan held preempted].)

## C. *Preemption Does Not Apply to Claims Against Parties Who Are Not ERISA Entities*

■ ERISA preemption does not apply to state claims asserted against a defendant who is not an ERISA entity. (*Butero v. Royal Maccabees Life Ins. Co.* (11th Cir. 1999) 174 F.3d 1207, 1212-1215.) Claims against non-ERISA entities are not preempted because ERISA "comprehensively regulates certain *relationships* [among ERISA entities] . . . . [¶] . . . State law is allowed to govern these relationships [with non-ERISA entities], because [it is] much less likely to disrupt the ERISA scheme . . . ." (*General American Life Ins. Co. v. Castonguay* (9th Cir. 1993) 984 F.2d 1518, 1521-1522.) Non-ERISA preemption of state claims against non-ERISA entities is a corollary to nonpreemption of claims that do not involve plan eligibility or administration; non-ERISA entities do not have authority to make plan eligibility or plan administration decisions.

ERISA entities are the employer, the beneficiaries under the plan, the plan, and the plan fiduciaries. (*Morstein v. National Ins. Services, Inc.* (11th Cir. 1996) 93 F.3d 715, 722.) In *Morstein*, the plaintiff was a plan beneficiary who filed a state law claim against an insurance agency and its agent, alleging they fraudulently induced her to change plans. The *Morstein* court reasoned that when a state law claim "brought against a non-ERISA entity does not affect relations among principal ERISA entities as such, then it is not preempted by ERISA." (*Ibid.*) The *Morstein* court held the claims were not preempted because the defendants, who "had no control over the payment of benefits or a determination of Morstein's rights under the plan," were not ERISA entities for purposes of invoking preemption. (*Id.* at p. 723; cf. *CSA 401(k) Plan v. Pension Professionals, Inc.* (9th Cir. 1999) 195 F.3d 1135, 1138-1139 ["persons who have no power to make decisions as to plan policy interpretations, practices or procedures" are not ERISA fiduciaries].)

■ Benitez's complaint alleges that respondents improperly denied her medical treatment. However, it does not allege that respondents were vested with authority to determine her eligibility under the plan for that treatment or that they denied the treatment because they determined she was ineligible under the plan. Accordingly, Benitez's claim does not allege facts suggesting she seeks to recover against respondents based on their conduct as plan fiduciaries. Respondents argue they nevertheless qualify as plan fiduciaries because, as the sole providers of specified medical benefits for plan participants, they controlled and determined whether or not plan participants would receive those medical benefits under the plan. Respondents argue that because the complaint alleges they denied those benefits to Benitez, Benitez's

state law claims necessarily assert misfeasance in their capacity as plan fiduciaries. However, as made clear in *Pegram v. Herdrich, supra,* 530 U.S. 211, a medical practitioner who makes treatment rather than eligibility decisions is not acting as an ERISA fiduciary even though the treatment decision has the incidental effect of granting or denying a patient the benefits of medical treatment under an ERISA plan.

We conclude that because Benitez alleges misfeasance by respondents in their capacity other than as an ERISA fiduciary or other ERISA entity, her claims against them are not preempted by ERISA.

D. *A Decision on the Remaining Issues Is Premature*

■ Benitez argues on appeal that respondents' motion to dismiss the complaint under the SLAPP statute is without merit and should be denied. Although Code of Civil Procedure section 425.16, subdivision (j) makes an order granting or denying a motion under that section appealable under Code of Civil Procedure section 904.1, the trial court neither granted nor denied that motion. Accordingly, there is no appealable order, and Benitez is not aggrieved by the trial court's action. Both an appealable order and the existence of an aggrieved party are jurisdictional requirements to an appeal. (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295-297 [50 Cal.Rptr.2d 493].) Benitez asserts a court may and should address issues likely to arise on remand (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 821, fn. 18 [94 Cal.Rptr. 796, 484 P.2d 964]), and therefore we should evaluate respondents' SLAPP motion. We decline Benitez's invitation because a court should avoid advisory opinions involving hypothetical facts (see generally *People v. Slayton* (2001) 26 Cal.4th 1076, 1084 [112 Cal.Rptr.2d 561, 32 P.3d 1073]) and it is impossible to predict whether respondents, after examining the extensive case law decided after the original SLAPP motion was filed, will choose to pursue that motion.[9] Accordingly, it is premature to consider Benitez's argument considering the application of the SLAPP statute to her complaint.

Amici curiae also invite us to address and resolve an issue not addressed below: whether respondents' First Amendment "freedom of religion" rights may be interposed as a defense to conduct otherwise actionable under the Act. We decline the invitation because this issue also appears premature. First, respondents have not raised a First Amendment defense to Benitez's

---

[9]Moreover, even if respondents resurrect their SLAPP motion, it is possible the court will deny the motion and, if respondents do not appeal the ruling, the issue will be moot as to this court.

claims, and it is therefore uncertain whether this issue will arise. Second, even assuming respondents' religious views caused them to decline to perform certain medical procedures, the facts are insufficiently developed to show whether these views influenced respondents to refuse to perform the procedures for *all* persons or for only certain classes of persons.[10] We decline to issue an advisory opinion on hypothetical facts (*People v. Slayton, supra,* 26 Cal.4th 1076, 1084), particularly when it is possible the issue will be resolved on nonconstitutional grounds. (Cf. *Ferguson v. Keays* (1971) 4 Cal.3d 649, 656, fn. 6 [94 Cal.Rptr. 398, 484 P.2d 70].)

## DISPOSITION

The judgment is reversed. The trial court is directed to enter an order overruling respondents' demurrer to the complaint. Benitez shall recover costs on appeal.

Huffman, Acting P. J., and McIntyre, J., concurred.

---

[10]The Act and other potentially applicable statutes (see Bus. & Prof. Code, § 125.6) prohibit discrimination. (Civ. Code, § 51.) We are cited no authority authorizing recovery under the Act if a patient was denied a specific procedure because her physician had decided (for religious or any other reason) not to perform that procedure for *anyone.*